## * HENRY H. LAUGHTON v. TOWN OF PUTNEY.

*Soldier's Bounty. Drafted Men. Constitutionality of the act to pay Bounty to Drafted Men. Consideration. Rescision.*

The law of 1863, authorizing towns in their discretion to vote money to be paid to dr fted men, is open to no valid constitutional objection. And a vote under this act is binding upon the town, and cannot be rescinded, and the consideration is sufficient to support the promise. The vote in this case was passed after the enactment of the conscription act.

ASSUMPSIT, for a town bounty. Plea, the general issue. Trial by court, September term, 1869, BARRETT, J., presiding, upon the following agreed statement of facts:

In July, 1863, the plaintiff being enrolled with other citizens of said town of Putney, in said town, as a soldier, or person liable to do military duty for the United States Government in the work of suppressing the then existing rebellion, was, in said month of July, 1863, under the conscription act then in force, with others of said citizens, drafted from said town into such military service, was accepted by the United States military authorities and furnished a substitute for himself who was duly accepted and mustered into such military service to the credit of said town, and applied on its quota under said draft in his stead.

* Tried February term, 1870.

Some of the persons thus drafted entered the service themselves, others procured substitutes and others paid commutation money.

On the 27th day of July, 1863, said town of Putney, at a town meeting legally warned and held in said town, voted a bounty of one hundred dollars to each person thus drafted, who was mustered into such service himself, or procured an acceptable substitute who was mustered into such service. This bounty of one hundred dollars was duly paid to the plaintiff, but he never has received any other bounty from said town. July 23d and August 25th, 1864, town meetings of said town of Putney were warned and holden and action taken, as follows:

4th. On motion, voted to pay those enrolled soldiers that were drafted and accepted, three hundred dollars ($300) each, less the sum they have received, agreeably to the 4th article.

2d. On motion, voted to re-consider the vote passed at a meeting holden on the 23d day of July, 1864, to pay the enrolled soldiers $300 in the 2d article of the warning.

The first vote was passed at the meeting of July 23d, and the last one at the meeting of August 25th, 1864.

The plaintiff demanded from said town the bounty of $200, claimed to be due him from said town, September 1, 1864. The case is submitted to the court upon the foregoing statement.

The court having rendered judgment *pro forma* for the defendant upon the foregoing agreed statement of facts, the plaintiff excepts.

*Field & Tyler*, and *Chas. N. Davenport*, for the plaintiff.

*Waterman & Read*, for the defendant.

The opinion of the court was delivered by

WILSON, J. It appears from the exceptions in this case that the plaintiff, a citizen of said town of Putney, was enrolled therein as a person liable to do military duty in the army of the United States, and being so enrolled and liable, he was, in July, 1863, drafted into the United States service under the act of Congress known as the " Conscription Act." He was accepted, and furnished a substitute, who was duly mustered into the service to the credit of the defendant town, and applied upon its quota under said draft. These facts bring the plaintiff within the vote of

the town, July 23d, 1864, to pay those enrolled soldiers of said town, that were drafted in 1863 and accepted, three hundred dollars each, less the sum they had received from the town.

The act of November 10, 1863, provided that towns might vote money to be paid to drafted men who had thereupon gone personally into the service, or who had furnished an accepted substitute. The facts show the plaintiff's case not only within the vote of the town, but also within the provisions of said act.

The main objections of the defendant to a recovery in this case are, 1st, that the town, on the 25th day of August, 1864, voted to rescind the vote of July 23d, 1864, under which the plaintiff claims to recover ; 2d, that, as the plaintiff had been drafted and had his election to go into the service himself, or furnish a substitute, the promise of the town to pay him a bounty was wholly void of consideration ; and, 3d, that the act of 1863, authorizing towns to vote money to be paid to drafted men, is unconstitutional. Assuming, for the present, that the vote to pay the plaintiff constituted a binding contract under the circumstances, the town could not rescind it. *Seymour* v. *Marlboro*, 40 Vt., 171 ; *Cox* v. *Mt. Tabor*, 41 Vt., 28 ; *Haven* v. *Ludlow*, 41 Vt., 418.

It is only by an express vote of a town that it can make such a contract with an individual. It was in this manner that the defendant made the promise, consequently the plaintiff's right to recover depends upon the sufficiency of the consideration of the promise and the constitutionality of the law under which it was made. The benefit which the defendant town had derived from the plaintiff, by reason of his having been drafted from that town and accepted, and his having furnished a substitute who was mustered in to the service and applied on the quota of the town under said draft, and service rendered by him in the army, constituted the consideration of the defendant's promise, and it is sufficient, unless this case is, in respect to the consideration of the vote, distinguishable from either of the cases heretofore decided by this court. *Seymour* v. *Marlboro*, 40 Vt., 171; *Cox* v. *Mt. Tabor*, 41 Vt., 28 ; *Hickok* v. *Shelburne*, 41 Vt., 409. The provisions of the acts of 1862 and 1863, respectively, show very clearly what the legislature regarded a sufficient consideration of the vote to render it, in this

respect, a binding contract as between the town and soldier. When he has voluntarily enlisted and entered the service from any town ; or has been drafted, accepted and gone personally into the service ; or furnished and put into the service his substitute, to apply on the quota of such town, he has done all the statute required of him as the consideration of the promise or vote of the town under the act relating to the manner in which he entered the service. If the soldier had performed his term of service before the vote to pay him a bounty, the town had derived a benefit from his having applied upon its quota, and the government from his service in the army. By entering the service according to the provisions of either of said acts, to the credit of a town, the soldier has performed part of the consideration of the promise of a bounty. The fact that the consideration is executory so far as it relates to the whole or part of the service to be performed during his term, can not affect the obligation of the promise, unless the soldier shall have deserted the service, or in some other way forfeited his rights under the contract. The legislature having thus declared by statute the consideration upon which a town might, by vote, bind itself to pay a bounty to a drafted man, it must be regarded sufficient, unless the statute itself is defective and inoperative, either in respect to the consideration, as being insufficient to support such vote, or unconstitutional upon the ground that the. legislature could not authorize towns to vote money for such purpose. If the legislature could authorize towns to vote money to be paid to drafted men, the consideration is sufficient to stand the test of the most rigid rule as to this element of a contract.

This brings us to consider the question whether the act of 1863 is constitutional. The discussion of this question will further develop the consideration upon which.such promise of a bounty is made. It is insisted by the defendant's counsel that the legislature could not authorize towns to vote money to be paid to drafted men, and on this ground the defendant claims that the act is unconstitutional. The argument of the defendant's counsel rests chiefly upon a supposed constitutional distinction between a law granting money to a volunteer, and one granting money to a drafted man. But the grounds of the legislation as indicated by the act of 1862, as

well as the act of November 10, 1863, show that the defendant's said objection is wholly unfounded. At the commencement of the rebellion it was found necessary to increase the army of the general government. While the rebellion existed and to aid in suppressing it, the president of the United States made proclamation, from time to time, calling for volunteers to serve in the army. The first call on Vermont, and other loyal states, was made the fore part of the year 1861, and after that others were made every year during the continuance of the rebellion till peace was restored to the country. During the fore part of the war it was generally believed not only that our army could be sufficiently increased, but replenished, by voluntary enlistments. To this end the general government, as an inducement for men to volunteer into the service, offered them reasonable pay and bounty. Recruiting agencies were established in all the loyal states. Prior to the act of 1862, inhabitants of some of the towns in this state had raised money by voluntary subscriptions and paid it to those · who had volunteered from such towns into the service. At the October session of our legislature in 1862, they passed the act authorizing towns to grant and vote money to be paid to volunteers. This was intended not only to encourage volunteering into the army, but a consideration for service rendered or to be rendered therein. The payment of a town bounty enabled many men to enter the service as volunteers who, but for such bounty, could not have done so without unreasonable sacrifice and loss. The provisions of that act were consonant with the policy of the general government encouraging volunteer service.

The constitutionality of the act of 1862, authorizing towns to vote money to be paid to volunteers, has been discussed before this court in several cases. In *Sears* v. *Wilmington*, heard at the general term, November, 1868, the question was raised and fully discussed, so far as it related to payment of bounties to volunteers for past services. Upon this question the court entertained no doubt as to the constitutionality of said act, and I am not aware that this court has expressed or entertained a doubt upon the subject in any case in which the question has been raised.

62

* Laughton *v.* Putney.

While volunteering into the service was one mode adopted and the first one practised in raising and recruiting our army, it was from the beginning the settled purpose of the government to suppress the rebellion, and to this end, draft men into the service when the number of volunteers should be found insufficient for that purpose. For nearly two years, during the fore part of the war, the several calls for volunteers were promptly satisfied ; but the rebellion still continued, and had become gigantic. The perils incident to the war were indicated not only by the graves of many of our soldiers, but by those living who had been rendered unfit for military duty. These circumstances required that the army should be not only recruited, but increased from time to time, to such extent as should be found necessary to restore peace. In order to do this, the general government not only continued to encourage enlistments, but in March, 1863, congress passed the *Conscription Act*, authorizing the drafting of men into the service, provided the call in any case for volunteers was not seasonably satisfied. The first draft in this state under said act was made in July, 1863, by counties. In October, 1863, the war department directed that the several towns should each be a sub-district, and be credited for recruits as such, and that the draft should be made by towns.

While the general government used persuasive means only for raising and recruiting the army, there was no occasion for the legislature to authorize towns to vote money to pay drafted men ; but when these means alone were found insufficient for the accomplishment of the object in view, and the government had superadded and enforced the provision for drafting men into the service as one of the means of procuring men to aid in suppressing the rebellion, the subject of authorizing towns to vote money in their discretion to be paid to that class of soldiers came properly before the legislature. It had already become apparent that the *situation* and *circumstances* of many men enrolled in this state as liable to do military duty had prevented and would prevent them entering the service as volunteers. To them the sacrifice and loss could be no less by their entering the service as drafted men. That there were very many enrolled men thus situated, in whom

there was no lack of *patriotism*, was generally conceded.   Hence the passage of said act, November 10, 1863.

It is said by the defendant's counsel that said act does not profess to have for its object " the encouragement of volunteering," but was for the " aid of drafted soldiers."   From this the counsel argue that the object of that act is private instead of public ; that it is inconsistent with the policy of the general government upon the subject of *volunteering*, and not promotive of the general good.   It is undoubtedly true that the federal government had authority to pay a bounty to volunteers and refuse all bounty to drafted men ; or to pay a bounty to both volunteers and drafted men ; or refuse a bounty to either.   Our legislature could have omitted to provide the monthly pay of seven dollars to our volunteers ; or have refused to authorize towns to vote money to be paid to such soldiers, or to any other class of soldiers.   But however much or little the federal or state government may have been influenced in their legislation upon these subjects by considerations of *patriotism*, as evidenced by volunteering or being drafted into the service, or expediency, is not important in determining whether the legislature had, in their discretion, the constitutional right to authorize the granting and voting of money by the towns for the purpose named in said act of 1863.   The volunteer to whom bounty had been voted would claim that the act of 1862 authorized such vote ; while the drafted man to whom a bounty had been voted would claim under the act of 1863.   One of them would claim under the former act, because he volunteered into the service, and the other under the latter act, because he was drafted into the service.   They both were regularly in the service, one of them by voluntary enlistment, the other by draft ; and both these were modes provided by the general government for raising men for the army.   Enlistments were authorized for as short a term as that of a drafted man.   The soldier who was drafted into the service and faithfully served there, satisfied the call and answered the same purpose, for he benefited the town upon whose quota he was applied, and the people and government in whose service he was engaged, as much as he could have done if he had gone into the service as a volunteer for the same term.   The volunteer had

his reasons for offering his services to his country, in advance of a draft, and the drafted man his for waiting and taking his chance with other enrolled men of being drafted. But in this, the latter violated no law of the federal or state government. This being so, neither the motive which led him to make choice of that mode of entering the service, if required to enter it at all, nor the fact that he served as a drafted man, or furnished a substitute, would constitute any valid objection to a law authorizing the town in its discretion to vote him a bounty. If we should examine into the real motive for such choice, it would be found in many cases to be perfectly consistent with the most commendable patriotism, as evidenced by his having, before the draft, procured men to volunteer into the service ; his having voted a liberal compensation to such soldiers and paid according to his means, and in some cases having influenced a brother to volunteer into the service who could better be spared than himself. These matters, relating to the grounds on which a person had declined to volunteer into the service, were proper to be considered by the town in determining whether it was expedient to vote him a bounty as a drafted man, but they do not affect the law authorizing such vote. It is said by the defendant's counsel, that if the plaintiff had volunteered under a promise of bounty, and thus lessened the chances of *others* to be drawn, or even if he had enlisted previous to the vote, there would have been a consideration, a benefit received by *them* through his *voluntary act*. But the government did not need or expect that all the men liable to do military duty would volunteer into the service. Each call was limited as to the number, and it was no more the duty of the plaintiff than of others similarly situated to volunteer. Hence, the plaintiff might have said to others if they had volunteered, it would have lessened his chance of being drawn. Neither the volunteer nor the drafted man becomes a soldier in the army until accepted and mustered into the service ; and unless so accepted and mustered, neither of them would render any service as a soldier, or apply on the quota of a town or other sub-district. But when both have been accepted and mustered in, their services alike become meritorious. The act of 1862, authorizing towns to grant and vote money to be paid to vol-

unteers, and the act of November 10, 1863, authorizing towns to grant and vote money to be paid to drafted men, are founded on the same principles in all their provisions as to which any constitutional question has been raised except so far as the provisions of the former act may have for their object the encouragement of volunteering ; but the fact that this is not one of the objects of the act of 1863 does not render it unconstitutional.

It is insisted by the defendant's counsel that when the plaintiff was drafted there was no obligation on towns, as such, to furnish soldiers.   This brings us to examine briefly the origin and nature of the rights, duties and obligations of the people individually, and as inhabitants of towns in their corporate capacity, and citizens of the government, as affected more or less by the late rebellion. The government of the United States was formed by the people acting in their highest sovereign capacity, and the compact thus formed among the states in such capacity, and constituting the people thereof one, for many purposes, could not be altered or annulled at the will of the states individually.   This some of the southern states sought to do ; they sought it by rebellion, and not by any means recognized by the constitution or laws of the country.   The rebellion, in its purpose and consequences, was hostile and destructive, not only to the government, but also to the political and civil rights of the people.   The calls for men to suppress the rebellion were addressed to the people, in which every loyal citizen had and felt a deep interest.   They assembled, during the fore part of the rebellion, not as towns or counties, but as citizens or inhabitants thereof, to consult in regard to the defense of their common interests, and for their common safety.   These could be preserved and secured only by defending the government.   They believed this would defend their rights as individuals, and their rights as members of community in all their corporate relations and interests.   During that period the raising of men for the army was regarded a duty primarily resting upon the people. They did not stop to discuss corporate duties or obligations, but furnished the men as they were called for, leaving all questions as to the rights and duties of the state and towns, respectively, to be settled when duly presented.   Prior to the act of 1862 relating

to volunteers, the inhabitants of this state liable to do military duty had been enrolled in the several towns in which such men resided, and each town had furnished the war department a copy of such enrollment. From this, the inhabitants of each town and the war department knew, or could know, who were thus enrolled in such town. It was generally understood that the number so enrolled in the state was much larger than the number that would be required to enter the service from this state during that war; yet the interest felt and taken in procuring men for the army was not confined to those enrolled as liable to military duty, but the people generally engaged in the work as zealously as they could have done in defense of a private right merely. By the order of the war department directing that the several towns should each be a sub-district and be credited for recruits as such, it became the duty of the inhabitants of each town, *first*, to fill their own quota. The assignment of town quotas and creating each town a sub-district, became necessary or expedient in view of the act of 1862, authorizing towns to grant and vote money to be paid to volunteers. From these orders the several towns received more definite information as to the extent of their duty in furnishing men, and each town could offer such inducements for volunteers to its credit as the inhabitants thereof should judge best. They understood that in case they should fail to fill their quota by volunteers, within the time limited for that purpose, the drafting of men to make up the deficiency would be from the men enrolled in that town, and not from all the men enrolled in that county as theretofore, and so it would be made in each town, in case of its failure to procure sufficient men to enter the service as volunteers. But the authority of the legislature to authorize towns to grant and vote money to be paid to soldiers, did not arise from the fact that each town had become a *sub-district* to which quotas would be assigned and credits given and from which drafts could be made, nor from the benefit which the town alone would derive from such credit.

We have shown that the liability to do military service as a volunteer or drafted man, was the same whether counties or towns constituted sub-districts. The duty of the soldier, as an inhabi-

tant of a town and citizen of the government, to aid in suppressing the rebellion, existed before the assignment of town quotas, and independent of the question whether the sub-district to which he belonged was or would be a county or a single town therein, and the change from one to the other did not affect his duty or the value of his service. The obligation or duty of the inhabitants of towns and other communities to aid in suppressing the rebellion, though they were not soldiers in the army, existed from the beginning of the war, and it did not arise from change of sub-districts, the assignment of town quotas, or from the order as to town credits. From the commencement to the end of that war, the service of a soldier was valuable not only to the government but to towns and the inhabitants thereof, for it was rendered in defense of their "common rights and interests." In view of the great number of men in the state, from which the number required of the state for the army could be obtained, it became and was an important inquiry as to the men among them who would be able to render the most efficient service in the army. That the soldier should be liberally paid, was not denied.

In view of the great number of men in this state who would not be required to enter the service; the rights and interests imperiled by the rebellion; the importance and value of the service that had been and would be rendered by those who entered the army, and of the perils to which they would be liable, it was generally conceded that they should receive compensation for their service in addition to payment made by the general government. No one claimed or could justly claim that a part of the people should pay the whole of such additional compensation or bounty. The feeling was general, that whatever sums might be offered for such purpose should be paid by the tax-payers according to their means as indicated by their several lists. This led to the passage, in 1862, of the act relating to volunteers, and also to the passage, in 1863, of the act relating to drafted men. By the provisions of those acts, the inhabitants of each town could exercise their own discretion and judgment, whether they would grant money to be paid to volunteers or drafted men or to both. But when any town has, by its vote at a regular meeting, promised to pay such bounty,

it is a binding obligation. The consideration upon which money is voted under the act of 1863, to be paid to a drafted man, whether such consideration be executed or executory, is sufficient. It does not differ in its legal effect from the consideration of a promise, under the act of 1862, granting money to be paid to volunteers. The benefit a town would derive from the credit of a soldier upon its quota has been held a sufficient consideration to support such express promise. *Cox* v. *Mt. Tabor*, 41 Vt., 28. But service rendered by the soldier in the army, or his promise or obligation to render such service, is the chief consideration of the promise to pay him a bounty. Money thus paid or promised by the town is a consideration for service rendered or to be rendered by the soldier, for the benefit of the public. The service of the soldier is no less valuable because it was rendered before the vote to pay a bounty, or even before the passage of the act authorizing such vote. Such consideration, even though executed, being sufficient to support an express promise if the town had been authorized to make it at the time the consideration was received, is sufficient to support an express promise made after the passage of the act authorizing such promise to be made. We think the law authorizing towns in their discretion to grant and vote money to be paid to drafted men is open to no valid constitutional objection. It does not infringe any express provision of the organic law of the state. The constitutional provision as to the anthority of the legislature upon the subject of taxation is, that "previous to any law being made to raise a tax, the purpose for which it is to be raised ought to appear of more service to the community than the money would be if not collected." By this provision it is evident that the subject rests, to a considerable extent, in the discretion of the legislature. That the state was under obligation to aid in suppressing the rebellion no one will deny. In order to do this, military service was required of our citizens, for which the state had the right to appropriate money to be paid to them for such service. The legislature could in their discretion have authorized the state treasurer to pay a bounty to volunteers and drafted men on the same constitutional grounds that they authorized the monthly payment of seven dollars to volunteers. Upon

grounds equally constitutional, we think, it was competent for the legislature to delegate to the inhabitants of towns the power to raise taxes for such purpose, to authorize each town in its discretion to grant and vote money to be paid to volunteers and drafted men from such town, in consideration of their military service and its benefit to the town and the public generally. It is to be observed that the vote to pay the plaintiff was passed after the passage of the conscription act and assignment of town quotas. We have, therefore, no occasion to decide as to the effect of such a vote before the order of the war department authorizing such assignment to be made.

The judgment of the county court is reversed and judgment for the plaintiff to recover the amount claimed, with interest, and his costs.