[No. 16241. *En Banc.* January 3, 1921.]

THE STATE OF WASHINGTON, *on the Relation of Louis F. Hart et al., Plaintiff,* v. C. W. CLAUSEN, *Respondent.*[1]

TAXATION (1)—PURPOSES—MORAL OBLIGATION. A moral and honorable claim upon the public treasury is a basis for the exercise of the taxing power.

COURTS (38)—FEDERAL QUESTION—PURPOSE OF TAX. Whether a tax is levied for a public purpose is as much a state question as it is a Federal question.

TAXATION (1)—PURPOSES—PUBLIC PURPOSE—SOLDIERS' BONUS ACT. The Veterans' Equalized Compensation Act, Laws of 1920, p. 7, § 1 *et seq.*, providing a payment of fifteen dollars a month to each person in active service during the World War, the appropriation being made as compensation for the service, is the recognition of a moral obligation and provides for the expenditure of money for a public purpose which may be met by general taxation.

Application filed in the supreme court November 30, 1920, for a writ of mandate to compel the state auditor to issue a warrant. Granted.

*The Attorney General* and *Nat U. Brown,* for relators.

*Frank C. Owings,* for respondent.

*Charles S. Albert, Stephen F. Chadwick,* and *Edward Robertson, amicus curiae.*

[1]Reported in 194 Pac. 793.

MAIN, J.—This is an original proceeding in this court, brought by the members of the state board of finance, seeking a writ of mandamus against the state auditor to compel him to issue a warrant upon the permanent school funds of the state in payment of a bond issued under what is known as the Veterans' Equalized Compensation Act. This law was enacted at the extraordinary session of the legislature in 1920, and was referred to the people for their approval or rejection pursuant to the seventh amendment to the state constitution and the acts passed to facilitate that amendment. At the general election held on November 2, 1920, the act was approved by the electors of the state, and on November 30, 1920, was proclaimed a law by the governor. Laws of 1920, p. 7, ch. 1.

The act provides, speaking generally, that there shall be paid to each person who was regularly called and listed, drafted, inducted, or commissioned, and who served on active duty in the army, navy, or marine corps of the United States during the war with the central allied powers, between the sixth day of April, 1917, and the eleventh day of November, 1918, the sum of fifteen dollars for each and every month, or major fraction thereof, of active duty performed between the dates mentioned. The act authorizes, as a means for the payment of the compensation provided, that there shall be issued and sold bonds of the state of Washington in the sum of eleven million dollars. The money realized from the sale of such bonds shall be deposited in the state treasury to the credit of a special fund to be known as the Veterans' Compensation Fund. The bonds and the interest thereon are to be paid by taxation. The act repeatedly refers to the payments to be made to the persons entitled thereto as a compensation for services rendered.

After the act became operative, the state board of finance voted to purchase a block of the bonds with permanent school funds. The state auditor, for the purpose of testing the question of the validity of the act, refused to issue a warrant in payment thereof. This action was then brought by the state board of finance to compel the issuance of the warrant by writ of mandate, as already indicated.

The question in the case is the constitutionality of the law referred to. It is argued by the respondent that the act is unconstitutional because, under its provisions, money is to be raised by taxation for a private purpose. The petitioners argue that the acts should be sustained because the money to be expended under its provision is for a public purpose. The pivotal and controlling question, then, is whether the purpose for which the money is to be devoted under the act is public or private. In order to justify an exercise of the taxing power of the state, it is necessary that the money to be raised thereby be devoted to a public purpose. No principle of the law is better established than that taxes can be levied only for public purposes, and that a tax levied for a private purpose is void. Gray, Limitations of the Taxing Power, § 169. As was said in *State ex rel. Reclamation Board v. Clausen,* 110 Wash. 525, 188 Pac. 538, it is not always easy to determine whether the purpose of an act in the exercise of the taxing power is public or private. It is there pointed out that there are three classes of cases: First, those where the purpose of the act is clearly public; second, cases where the purpose is clearly private; third, a twilight zone between these two where the question as to whether the purpose is public or private is difficult of determination. It was there held that, where the question of the purpose presented opportun-

ity for difference of opinion as to whether it was public or private and fell within the zone of indefinite cases, the question was one for the legislature, and when that body had exercised its discretion, it would not be disturbed by the courts. If the purpose for which the taxing power is exercised is a public purpose, a moral obligation on the part of the state to meet that purpose is sufficient to sustain the law. In other words, if there is a moral and honorable claim upon the public treasury, although there be no debt which could obtain recognition in a court of law or equity, a basis for the exercise of the taxing power is furnished. 26 R. C. L. 65; *Blogge v. Bolch,* 126 U. S. 439; *United States v. Realty Company,* 163 U. S. 427. In the case last cited, speaking upon the question of the sufficiency of the moral or honorable obligation to sustain a tax, it was said:

"There was enough in the case as presented to Congress upon which to base the assertion that there was a moral and honorable claim upon the public treasury which that body had the constitutional right to recognize and pay.

"Under the provisions of the Constitution, (article 1, section 8), Congress has power to lay and collect taxes, etc., 'to pay the debts' of the United States. Having power to raise money for that purpose, it of course follows that it has power when the money is raised to appropriate it to the same object. What are the debts of the United States within the meaning of this constitutional provision? It is conceded and indeed it cannot be questioned that the debts are not limited to those which are evidenced by some written obligation or to those which are otherwise of a strictly legal character. The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual

when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded.''

The question whether a tax is levied for a public purpose, is a Federal as well as a state question. In this respect there is no difference between the powers of the legislature and that of the Congress of the United States. That which is a public purpose, under one constitution, and will sustain the exercise of the taxing power, is a public purpose under the other. In this respect, Congress stands upon a level with the state legislature. In *State ex rel. State Reclamation Board v. Clausen, supra,* it was said:

''We must concede that the question of whether or not the tax is levied for a public use is a federal as well as a state question. To take property by taxation for other than a public purpose is as much a violation of the due process of law guaranty of the fourteenth amendment to the Federal constitution as of any similar provision of the state constitution. This is made plain by the decision of the Supreme Court of the United States in *Olcott v. Supervisors,* 83 U. S. 678.''

In *United States v. Realty Company, supra,* this language is used:

''Of course, the difference between the powers of the state legislatures and that of the Congress of the United States is not lost sight of, but it is believed that, in relation to the power to recognize and to pay obligations resting only upon moral considerations, or upon the general principles of right and justice, the Federal Congress stands upon a level with the state legislature.''

If the same considerations present a public purpose under the one constitution as under the other, it follows that the decision of the Federal supreme court upon the question would be persuasive, even though not controlling. Since the decision in *Walton v. Cotton,* 60 U. S. 658, that court has repeatedly sustained the power of Congress to raise money by taxation for the purpose of paying pensions and compensating those who have rendered military service. There is no case from that court, so far as we are advised, holding otherwise. In *United States v. Hall,* 98 U. S. 343, the court sustained the pensioning power in Congress and, in the course of the opinion, used this language:

"Bounties may be offered to promote enlistments, and pensions to the wounded and disabled may be promised as like inducements. Past services may also be compensated, and pensions may also be granted to those who were wounded, disabled, or otherwise rendered invalids while in the public service, even in cases where no prior promise was made or antecedent inducement held out."

Acts of Congress exercising the taxing power for the purpose of making compensation for past services and the payment of pensions where no prior promise or inducement was held out are sustained upon the ground that, for such services, there is a moral and honorable obligation which Congress has the right to recognize. The state cases are not in harmony upon the question; that is, whether the taxing power may be exercised in making compensation for services previously rendered where no promise or inducement was made or held out prior to the service. It is conceded and it is the universal law, so far as we are advised, that the taxing power may be exercised for the purpose of inducing enlistment in the military service of

the Federal government because such expenditures are for a public service.

. As types of the state cases which take the same view as the Federal supreme court, *Franklin v. State Board of Examiners*, 23 Cal. 173, and *Laughton v. Town of Putney*, 43 Vt. 485, may be cited. These cases and others recognize the doctrine that a moral obligation is sufficient to sustain the exercise of the taxing power, even when such power is not exercised until after the service has been rendered, provided the purpose of the law be to compensate for a public service. It is unnecessary to do more than suggest that, if the service is private, then the law will not sustain the exercising of the taxing power for that purpose. In the case last cited, it was said:

"But service rendered by the soldier in the army, or his promise or obligation to render such service, is the chief consideration of the promise to pay him a bounty. Money thus paid or promised by the town is a consideration for service rendered or to be rendered by the soldier, for the benefit of the public. The service of the soldier is no less valuable because it was rendered before the vote to pay a bounty, or even before the passage of the act authorizing such vote. Such consideration, even though executed, being sufficient to support an express promise if the town had been authorized to make it at the time the consideration was received, is sufficient to support an express promise made after the passage of the act authorizing such promise to be made."

As types of cases recognizing the rule that taxes raised and expended for the purpose of inducing the entry into the military service are for a public service and therefore valid, but that, if such power is not exercised until after the performance of the services, then the purpose becomes private and the law cannot be sustained, cases from Massachusetts and New York

may be cited. *Mead v. Acton,* 139 Mass. 341, 1 N. E. 413; *Bush v. Board of Supervisors,* 159 N. Y. 212, 53 N. E. 1121, 70 Am. St. 538, 45 L. R. A. 556. Those cases proceed upon the theory that, in order to sustain a tax, there must be a legal or equitable claim against the state. They do not recognize the general rule that a moral or honorable obligation is sufficient, which is the basis upon which the Federal supreme court sustains Congress in the exercise of the pensioning power, and is the basis upon which other state courts have sustained the power of the legislature to make an appropriation for military service after such service had ceased. There are other cases taking the same view as the Massachusetts and New York cases, and also others taking the opposite view in addition to those cited. It did not, however, seem necessary here to set out all the state cases and numerically balance one line of holdings against the other. It is interesting to note, however, that in *In re Opinion of Justices,* 175 Mass. 599, 57 N. E. 675, 49 L. R. A. 564, referring to *Mead v. Acton, supra,* it was said that the ground of that decision went very far and that some of the language used therein "may need qualification."

The cases decided during and since the close of the world war will here be referred to. In *State ex rel. Morris v. Handlin,* 38 S. D. 550, 162 N. W. 379, the court had before it a law passed by the legislature of that state in the year 1917 which provides that every enlisted man of the Fourth South Dakota Infantry called into the Federal service for duty on the Mexican border in 1916 and 1917 should be paid the sum of seventy-five dollars, and making an appropriation from the general state funds. The act was passed after the service was rendered and was sustained by the court. That case is somewhat severely criticised

19—113 WASH.

because it is claimed that it does not clearly set out the grounds upon which the decision rests. But it seems, from a careful reading of the opinion, that it was the view of that court that the purpose was public because the appropriation was made in furtherance of and for the purpose of encouraging the organization and maintenance of a more effective militia. It was there said:

"It is therefore very clear that this appropriation in question was not made as a gift, nor from motives of charity, although the individual members of this regiment were to receive it; but it was made on the ground of and because it was beneficial to the people of this state for purposes of protection to the public. It was made with a view of securing protection to the lives, liberties, and property of the citizens of this state. This is the expressly avowed purpose of our state constitution authorizing the Legislature to establish and maintain a volunteer national guard or militia."

In *State ex rel. Atwood v. Johnson,* 170 Wis. 218, 175 N. W. 589, the supreme court of the state of Wisconsin had before it a law passed by the legislature of that state in 1919 which is referred to as the Soldiers' Bonus Act, which provided that there should be paid those who entered the military service of the United States from that state in the war against the German Empire and its allies a sum not exceeding ten dollars for each month of service, with a minimum of fifty dollars. The law was sustained, following the earlier case from the same state of *Broadhead v. Milwaukee,* 19 Wis. 658, but like that case was based upon the ground of gratitude. In other words, that the gratitude due the soldier was not an idle sentiment and that the state, through the legislature in the exercise of its taxing power, might give expression to that gratitude by providing for the payment, to all who had been in the military service, of the amount of

money specified in the act. In *Gustafson v. Rhinow,*
144 Minn. 415, 175 N. W. 903, the supreme court of
Minnesota had before it an act passed by the legisla-
ture of that state similar to the one passed by the
legislature of the state of Wisconsin, and it was sus-
tained by the supreme court of Minnesota upon the
same ground that the supreme court of Wisconsin sus-
tained the act of that state. Whether the doctrine of
gratitude upon which those decisions are rested is suf-
ficient to justify the exercise of the taxing power is a
matter which we will pass without determination be-
cause, in our view, there is a more substantial legal
basis upon which the constitutionality of such laws
can be rested.

In the spring of the year 1917, the aggressions of
the Imperial German government had reached the
point where the integrity of our institutions and the
lives and property of the citizens of this country were
in grave peril. Our ships had been sunk without cause
upon the high seas, and our citizens killed while pur-
suing their lawful occupations. The matter, perhaps,
cannot be better summed up than in the language of
President Wilson in his address to the joint session of
the two houses of Congress on April, 1917, wherein,
after reciting the illegal acts of the German nation, it
was said:

"It is a war against all nations. American ships
have been sunk, American lives taken, in ways which
it has stirred us very deeply to learn of, but the ships
and people of other neutral and friendly nations have
been sunk and overwhelmed in the waters in the same
way. There has been no discrimination. The chal-
lenge is to all mankind."

In the same address, the President further said:

"We are accepting this challenge of hostile purpose
because we know that in such a government, following

such methods, we can never have a friend; and that in the presence of its organized power, always lying in wait to accomplish we know not what purpose, there can be no assured security for the democratic governments of the world.''

Accordingly, on April 6 following, war was declared, and under acts of Congress the resources of this country, manual, economical and financial, were co-ordinated for the purpose of meeting and overcoming the threatened peril and preserving the institutions of this country and protecting the lives and property of the citizens thereof. It was into this cause that the men who are to receive compensation under the act in question entered under the selective draft. Services rendered in such a cause must necessarily be a public service. It is admitted and it is the universal authority, as already pointed out, that, if the act in question had been passed for the purpose of inducing the entering into the service, the money to be expended would have been for a public purpose. If the inducing to enter the service is a public service, it is difficult to see why the service rendered after such entry therein is not also a public service.

Without citing the authorities, it may be stated that it is also well established that appropriations to be paid by general taxation may be made for the payment of money for distinguished and exceptional service in the military forces or in the bestowal of medals, swords, decorations, or other badges of honor, and in the erection of monuments. This, on the theory that the expenditure of such money for such purposes would tend to encourage the spirit of loyalty and patriotism and so promote the public good by affording visible evidence that hereafter, if there should be a call for men, the commonwealth would not forget those who had served its cause. Likewise, it may be said,

if money expended for those purposes is for a public purpose, it would seem that the same reason would exist where appropriation has been made as compensation for those who have rendered service. The act before us is based upon the theory of compensation, or compensation in addition to that which the beneficiaries thereunder have already received from the Federal government. For the service rendered by those who came within the terms of the act in the cause which was then of paramount importance, there arose a moral obligation to compensate for such service, and as has already been pointed out, such an obligation is sufficient to sustain the taxing power of the state. This decision will be rested upon the ground that the legislative power of the state is sufficient to enable it to make compensation for the services rendered, because there is a moral obligation to compensate for those services and that such services were public and not private. As above pointed out, this is a doctrine which is well supported by the adjudicated cases, including the United States supreme court and a number of state courts of last resort. The services, it is true, were rendered while the parties were in the Federal army, but this can make no difference. The state is one of the component parts of the nation and is equally interested with the national government in sustaining its institutions. The perils of the national government are the perils of the state. The success or defeat of the former is the success or defeat of the latter. The overthrowing of the national government, as was threatened by the Imperial German government when the war was entered upon, would mean the destruction of the state as it is now constituted. The state has the right to recognize a moral obligation to compensate for services rendered primarily in behalf of

the Federal government. Upon this proposition there appears to be uniformity of view. In this state the doctrine is recognized in the case of *State ex rel. Board of Com'rs v. Clausen*, 95 Wash. 214, 163 Pac. 744, where the court sustained a statute which imposed upon Pierce county the obligatory duty of acquiring and conveying to the Federal government the lands now embraced within the limits of Camp Lewis. In the course of the opinion, it was said:

"While the mobilization and training of the Federal soldiery to aid in the suppression of insurrection or the repelling of invasion is in a sense the duty of the Federal government, it is likewise a state duty to which the state may be called upon to contribute its aid."

Our attention has been called to § 25, of art. 2, of the state constitution, which provides that the legislature shall never grant any extra compensation to any "public officer, agent, servant or contractor after the services shall have been rendered or the contract entered into   .   .   ." But this provision has no application to the present statute. The parties who are to receive compensation under the act do not come within the constitutional specifications. This provision of the constitution does not seem to be insisted upon, and it would necessarily prolong this opinion to enter upon a further discussion of it.

A writ of mandamus will be issued direct to the state auditor requiring him to issue a warrant as prayed for in the petition, and it is so ordered.

HOLCOMB, C. J., FULLERTON, MITCHELL, PARKER, TOLMAN, and BRIDGES, JJ., concur.

MACKINTOSH, J. (concurring)—I think the reasoning of this case is sound, and therefore concur in Judge Main's opinion. The purpose for which the bonds are

to be issued is unquestionably a public one, while I am still of the opinion that the purpose in the case of *State ex rel. Reclamation Board v. Clausen,* 110 Wash. 525, 188 Pac. 538, was private.