[No. 16613.  *En Banc.*  September 13, 1921.]

# Max Maximillian, *Appellant,* v. C. W. Clausen, *as State Auditor, Respondent.*[1]

Bounties — Persons Entitled — Statutes — Construction.  The soldiers' bonus act (Laws 1920, Ex. Sess., p. 7) providing for payment of equalized compensation to veterans of the war with the central allied powers who "were regularly called, enlisted, drafted, inducted or commissioned, and commissioned and who served on active duty between April 6, 1917, and November 11, 1918," contemplates payment to those only who were residents of the state and who between April 6, 1917, and November 11, 1918, abandoned the material advantages of civil life during such period to aid in the defense of their country.

### On Rehearing.

Statutes (9)—Effect of Partial Invalidity. · The fact that the soldiers' bonus act (Laws 1920, Ex. Sess., p. 7, § 1) can be construed by its language as including payments to persons not entitled thereto does not render the act inoperative as to those who are entitled to its benefits.

Bounties — Persons Entitled.  Under the soldiers' bonus act (Laws 1920, Ex. Sess., p. 7, § 1), any bona fide resident of the state who entered the military or naval service of the United States, abandoning civil life for the purpose of aiding the nation and the state in the emergency of the war with the central allied powers during the period between April 6, 1917, and November 11, 1918, and was actually on active service during such period, is entitled to the bonus, regardless of the time of entry in such service, if such entry resulted in the abandonment of the material advantages theretofore enjoyed by him in civil life.

Same—Duties of State Auditor.  It being the duty of the state auditor to pass upon application for a soldiers' bonus, when he determines the facts entitling the applicant to compensation, he must allow the same regardless of the time of entry into the service.

Appeal from a judgment of the superior court for Thurston county, Wilson, J., entered June 10, 1921, in favor of the defendant, dismissing mandamus proceedings to compel the state auditor to pay a claim against

[1]Reported in 200 Pac. 583; 203 Pac. 379.

the veterans' compensation fund, after a hearing on the merits. Affirmed.

*Philip Tworoger,* for appellant.

*The Attorney General* and *John H. Dunbar, Assistant (John A. Frater,* of counsel), for respondent.

PARKER, C. J.—The plaintiff, Maximillian, having served in the army of the United States during the late world war and deeming himself entitled to compensation from the state of Washington under our veterans' equalized compensation act (being ch. 1, p. 7, of the Laws of 1920, Extraordinary Session of the Legislature) made application accordingly to the state auditor. His application having been denied by the auditor, he sought by mandamus proceedings in the superior court for Thurston county to compel payment in accordance with his application. A hearing in the superior court upon the merits resulted in a judgment of dismissal, denying the relief sought by the plaintiff, from which he has appealed to this court.

The controlling facts are not in dispute, and may be summarized as follows: On November 4, 1914, which date, it is to be noticed, was long before the United States entered the world war, and at a time when the United States was at peace with all the world, appellant enlisted in the military service of the United States, at Jefferson Barracks, in the state of Missouri. At that time he was not a resident of the state of Washington; indeed, he had then never been in the state of Washington. His certificate of discharge from the military service of the United States, introduced in evidence in his behalf, does not show the term for which he enlisted; that certificate showing only the date of his enlistment as November 4, 1914, the date of his discharge as June 4, 1920, and that he

was "serving in second enlistment period at date of discharge." Touching the question of the term of his enlistment commencing on November 4, 1914, and as to whether or not there was another enlistment by him at a later time when he claims to have become a resident of the state of Washington, he testified as follows:

"Q. When did you enlist in the army? A. November fourth, 1914. Q. And after your enlistment, where were you stationed? A. At Jefferson Barracks until December, 1914. Q. Where were you sent from Jefferson Barracks? A. Fort Casey, Washington. Q. How long were you stationed at Fort Casey? A. From—until I left for France sometime in 1918. Q. How long was your enlistment for? A. Three years with the colors and four in reserve. Q. And when you lived at Fort Casey you lived in barracks, didn't you? A. Yes. Q. All the time that you were there you lived in barracks? A. Yes. Q. In 1917 you did not re-enlist, did you? A. No."

His service in the army was continuous from his enlistment in 1914 until his discharge in 1920, he evidently being retained and continued in the service under his reserve period of enlistment mentioned in his testimony. We think it is thus apparent that the reference in his certificate of discharge to his at that time "serving in second enlistment period" is merely a reference to the reserve period of his enlistment, and does not, in the light of his testimony, evidence a new or independent enlistment. He claims to have become a resident of the state of Washington prior to the commencement of his reserve period of enlistment, and evidence was introduced in his behalf in an effort to show the establishment of his residence in this state before that time, with a view of inducing the court to hold that his reserve period was, in legal effect, a new enlistment during the war, while he was

a resident of this state. We do not here notice the evidence touching the claimed establishment of his residence in this state, since we have concluded that his residence is of no controlling force in the disposition of his claimed right here involved, in view of the fact that his enlistment was in the regular army of the United States long before our country entered the world war.

The language of the title and body of our veterans' equalized compensation act to be here considered is as follows:

"An Act providing for the payment of equalized compensation to veterans of the war with the Central Allied Powers, authorizing the issuance and sale of state bonds and the levy of a tax to pay said bonds, making an appropriation, providing penalties, and providing for the submission of this act to a vote of the people.

"*Be it enacted by the Legislature of the State of Washington:*

"Section 1. There shall be paid [1] to each person who was regularly called, enlisted, drafted, inducted or commissioned and who served on active duty in the Army, Navy or Marine Corps of the United States between the 6th day of April, 1917, and the 11th day of November, 1918; [2] and to each person who, being a citizen of the United States at the time of his entry therein, served on active duty in the naval, military or air forces of any of the governments associated with the United States during the war with the central allied powers between the 6th day of April, 1917, and the 11th day of November, 1918; [3] and who, at the time of his call, enlistment, induction, commission or service, was a *bona fide* resident of the state of Washington, the sum of fifteen dollars ($15.00) for each and every month or major fraction thereof of active duty performed subsequent to April 6, 1917, and prior to November 11, 1919: . . ." Laws of 1920, p. 7, ch. 1.

We have, for convenience of separate reference, numbered the three parts of this quoted language of the body of the act which are separated by semicolons. The second part seems to be of no moment in our present inquiry. The first part, read without thought of the word "service," found in the third part, seems to plainly limit the right to "equalized compensation" to those who were "called, enlisted, drafted, inducted or commissioned" within the specified war period and who "served" within that period. In other words, a claimant must have *entered the service within that period,* as well as *performed the service within that period,* in order to entitle him to the compensation provided for by the act. We think the words "equalized compensation," found in the title of the act, shed light upon the legislative intent to be gathered from the language of the body of the act which might seem somewhat uncertain in its meaning. The word "service," in the third part of the quoted language of the act, being separated by the disjunctive "or" from the words "called," "enlisted," "drafted," "inducted," "commissioned," may seem to furnish ground for arguing that mere service in the world war by a resident of this state, regardless of the time or manner of entering the military service, would entitle such resident to the compensation provided for by the terms of the act. We think, however, that such is not the meaning of the act, in view of the language of its title and the first part of the above quoted language of the body of the act. When appellant entered the military service of the United States he voluntarily chose such service as a vocation, at a time when there was no law under which he could be compelled to enter such service, and at a time when the nation was at peace with all the world. It is true that

he also then bound himself to such military service in time of war, should the nation be at war during his term of enlistment; but he did not at any time forego the material advantages of civil life for the express purpose of defending his country in its hour of peril; as did those who either voluntarily or under the selective service law entered the military service of their country, not as a vocation, but solely for its defense in its hour of peril.

Reading as a whole the language of the body of the act, above quoted, in the light of the language of its title, we feel constrained to hold that, by the passage of the act, there was expressed the state's legislative intent to further compensate for their military service during the world war only those who abandoned the material advantages of civil life to aid in the defense of their country during the specified war period.

The judgment is affirmed.

HOLCOMB, BRIDGES, FULLERTON, MAIN, TOLMAN, MITCHELL, and MACKINTOSH, JJ., concur.

## ON REHEARING.

*[En Banc.  January 5, 1922.]*

MACKINTOSH, J.—The opinion filed in this action on September 13, 1921, was thereafter, upon the granting of a petition for rehearing, reconsidered, and the court is of the mind that the reasoning in that opinion should not prevail.

Section 1, ch. 1, p. 7, Ext. Session Laws of 1920, is as follows:

"There shall be paid to each person who was regularly called, enlisted, drafted, inducted, or commissioned and who served on active duty in the Army, Navy or Marine Corps of the United States between the 6th day of April, 1917, and the 11th day of No-

vember, 1918; and to each person who, being a citizen of the United States at the time of his entry therein, served on active duty in the naval, military or air forces of any of the governments associated with the United States during the war with the central allied powers between the 6th day of April, 1917, and the 11th day of November, 1918; and who, at the time of his call, enlistment, induction, commission or service, was a *bona fide* resident of the State of Washington, the sum of fifteen dollars ($15) for each and every month or major fraction thereof of active duty performed subsequent to April 6, 1917, and prior to November 11, 1919.''

Although this section is subject to the interpretation given it by this court in the prior decision, above cited, upon a review, as we have said, of the question we are satisfied that the interpretation is not the proper one to be given, for the reason that it now appears that it excludes from the operation of the act a great many persons who were specially intended by the legislature to receive equalized compensation. We therefore believe that the interpretation to be given to the section is that there shall be paid a bonus to every person in the military service of the United States, a citizen of the United States and a *bona fide* resident of the state of Washington, who was on active duty between the 6th of April, 1917, and November 11, 1918. The act, by its terms, includes every soldier and sailor, no matter when he may have entered military service, provided he served between the dates mentioned. It is unnecessary to refer to the title of the act to add to or explain the meaning of this section. The only thing necessary is to apply the plain language of the section to the situation presented by the facts of this case; which are, that the appellant entered the military service of the United States long prior to the emergency created by the world war, and did not enter only and

for, or in anticipation of, defending this nation and this state during that emergency. To allow him and others similarly situated the compensation provided would be to render the act unconstitutional. As pointed out in this court's opinion passing on the constitutionality of the act in question (*State ex rel. Hart v. Clausen,* 113 Wash. 570, 194 Pac. 793), the payments are to be made for the purpose of equalizing the compensation of those who left their ordinary peaceful pursuits and entered into military service at a sacrifice and for the specific purpose of protecting the nation and the state in a specific emergency. Those who did not do this are not entitled to compensation, and the state has not the power to make payments which would not be equalizing compensation but would be mere gratuities.

The act, then, by its language, includes payments to persons who, under the law, are not entitled thereto, but this does not render the act inoperative as to those who are entitled to its benefits. In other words, although the act, by its terms, applies to every person in the military service between April 6, 1917, and November 11, 1918, it can only apply to those who, as we said in the prior opinion in this case, "abandoned the material advantages of civil life to aid in the defense of their country during the specified war period." The appellant, not being in this class, was not entitled to compensation under the act.

Although this disposes of the question before us, upon a reargument of the case it has been made to appear that a great many citizens of the United States and *bona fide* residents of this state, who had "abandoned the material advantages of civil life to aid in the defense of their country during the specified war period," and who have performed active service between

the dates mentioned, have claims pending, and for the purpose of avoiding further litigation, it is advisable to lay down a rule covering those cases.

It being the duty of the state auditor to pass upon the applications for compensation, the determination of whether an applicant, being a citizen of the United States and a *bona fide* resident of this state, entered the military service (army, navy or marine corps), and abandoned civil life with the intention and for the purpose of aiding the nation and the state in the emergency, and was actually on active service during the period laid down in the statute, are facts to be determined by such officer in passing upon such applications. When the state auditor determines that a citizen of the United States and a *bona fide* resident of this state left civil life and entered in the manner specified, it is the duty of the state auditor to allow compensation, regardless of the time of such entry into such service, if it clearly appear that such entry was made to meet the specific emergency and resulted in the abandonment of the material advantages theretofore enjoyed in civil life and which he would not otherwise have so abandoned. Judgment affirmed.

FULLERTON, MAIN, TOLMAN, BRIDGES, MITCHELL, and HOLCOMB, JJ., concur.

PARKER, C. J. (concurring)—Further reflection has induced me to now concur in the result reached by Judge Mackintosh touching the meaning of the act in question. I am, however, induced to so concur only because of the language of the title to the act, which seems to me to shed light upon the language of the body of the act. In other words, I feel that I would be unable to so concur if I felt compelled to rest my conclusion as to the meaning of the act upon the lan-

guage found in the body thereof, without reference to the title.

Hovey, J. (concurring)—I concur in the result reached by the majority opinion, but I do not wish to assent to the doctrine that you can import words into an act for the purpose of avoiding the conclusion that it is unconstitutional. When the title of the act is considered and given its proper application to the statute, this difficulty is overcome. Where the statute is ambiguous and the intent of the legislature cannot be clearly ascertained from its terms the title is an important aid. Even at common law, where the acts did not always have titles, and what they did have were prepared by the clerks, yet they were sometimes considered in getting at the meaning of the act. For an interesting discussion with many citations see *Mutual Fire Ins. Co. v. Stokes*, 9 Phila. Rep. 80. The courts of this country have adopted the same principle from the earliest times. In *United States v. Fisher*, 2 Cranch 358, 2 Law Ed. 304, decided in 1804, Chief Justice Marshall refers to the title of the act in explaining the meaning of its body. And in the later case of *Church of Holy Trinity v. United States*, 143 U. S. 457, where the title of the act relating to immigration referred to laborers as the persons aimed at, the same court held this was sufficient to limit general language in the body of the act applying to all foreigners. It is quite generally recognized that in states having a constitutional provision like ours, where the object of the act must be stated in the title, even more importance is attached to it. The rule is stated in Sutherland, Statutory Construction, § 339, and the cases cited clearly support the text.

Closely connected with the foregoing principle, and, in fact, one of the grounds upon which many of the

cases where it is applied are based, is that "where great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature be plain; in which case it must be obeyed." *United States v. Fisher, supra.*

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body." *Church of Holy Trinity v. United States, supra.*

The title of this act contains the following: "For the payment of equalized compensation to veterans of the war with the central allied powers." This shows that this act contemplated two things: (1) Equalized compensation. It is a matter of common knowledge that this country was confronted with the necessity of taking part in the greatest war the world has ever known, and that the great majority of the men who left civil life to perform their duties as loyal citizens did so at considerable financial sacrifice, and that the object of this legislation was to increase the compensation to the men so situated. (2) Veterans of the war. It is also well known to every one that service in the world war was the act to be rewarded, and not the particular date of the enlistment. This is made plainly apparent by the latter portion of § 1, which extends the benefits of the act to those who served in the forces of the governments associated with the United States, the dates there being specifically applied to the time served. It is apparent that to reward the men last mentioned and to deny the same reward to men who enlisted in our own army under the same circumstances would be a gross injustice and something that the legislature must certainly not have intended. Nor

do I think the act should be so construed when it is considered as a whole and in view of the principles which I have applied.