HANLEY *v*. STATE OF INDIANA, INDIANA DEPARTMENT OF CONSERVATION ET AL.

[No. 29,170. Filed December 21, 1954. Rehearing Denied May 20, 1955.]

*Symmes, Fleming & Symmes, Charles Symmes, Lewis C. Bose,* all of Indianapolis, and *Waldo C. Ging,* of Greenfield, for appellant.

*Edwin K. Steers,* Attorney General, *Owen S. Boling* and *Harry E. Riddell,* Deputy Attorneys General, for appellees.

*Ralph B. Gregg, Lawrence H. Hinds* and *Sheldon A. Key,* of Indianapolis, *Paul G. Jasper,* of Plainfield, and *William E. Wolf,* of Greenfield, for the American Legion, as *Amicus Curiae.*

*Jesse W. Peden,* of Indianapolis, for Disabled American Veterans Department of Indiana, Inc., as *Amicus Curiae.*

*William S. Mercuri,* of Indianapolis, for Veterans of Foreign Wars, Indiana, as *Amicus Curiae.*

GILKISON, C. J.—On May 27, 1953, appellant filed his complaint in Marion Superior Court, Room 3, against appellees, asking a declaratory judgment that section 11-1424, Burns' 1942 Repl., Cumulative Supplement, be declared unconstitutional. Upon motion properly made the venue of the cause was changed to the Hancock Circuit Court. In due time a second amended complaint was filed, and the same was put at issue by answer.

Upon trial there was a finding for appellees, that Sec. 11-1424 Burns' 1942 Repl. Cumulative Supplement is constitutional, that plaintiff take nothing by his complaint, and that defendants recover costs. Judgment was rendered accordingly. A motion for new trial was overruled and the appeal was perfected.

No procedural questions are presented. All parties direct their efforts to the one question: Is the involved statute constitutional?

That part of the statute particularly questioned is as follows:

"11-1424. Persons to whom issued—Forms—How issued—Duty of Clerks—Expiration—Application—Discharge papers—Duty of permittee—Unlawful acts.— (a) The director is hereby authorized and required to prescribe and furnish permits to hunt, trap and fish in this state to honorably discharged soldiers, sailors, marines, nurses, or women's corps of the army, navy, and marines, who served in the army, navy, or marine corps of the United States during the Civil War, the War with Spain, the Philippine Insurrection, the service on the Mexican Border during 1916 and 1917, the World War I or the World War II, who, at the time

of application for such permit, and who for a full period of six [6] months next preceding the date of application, where [were] bona fide residents of this state.

(b) The form of such permits and the application therefor shall be prescribed by the director. Such permits shall be issued in each county of the state by the clerk of the circuit court, without charge to permittee, only to such soldiers, sailors, marines, nurses, and women's corps of the army, navy and marines, above mentioned who are, at the time of making application, bona fide residents of such county; except that in the county of Marion, such permits shall be issued only by the director, without charge to permittee, to said soldiers, sailors, marines, nurses and women's corps of the army, navy and marines only who are bona fide residents of that county." Acts 1945, Ch. 93, p. 209.

The remaining subsections (c), (d), (e) and (f) are questioned, but the reasons therefor are contained in subsections (a) and (b).

It is appellant's contention that the involved statute is in conflict with Article 1, Sec. 23 of the Constitution of Indiana, providing:

"The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

It is further contended that the statute is in conflict with Sec. 1 of the Fourteenth Amendment of the Constitution of the United States in so far as it provides:

". . . No state shall make or enforce any law which shall deny to any person within its jurisdiction the equal protection of the laws."

In determining the constitutionality of the statute involved, we will indulge all reasonable presumptions

in its favor. *State ex rel. Harrison* v. *Menaugh et al.* (1898), 151 Ind. 260, 266, 51 N. E. 117 and 357; *Townsend* v. *State* (1897), 147 Ind. 624, 47 N. E. 19; *Kirtley* v. *State* (1949), 227 Ind. 175, 179, 84 N. E. 2d 712.

Therefore, the burden is upon the attacker, in this case the appellant, to overcome the presumption noted. *Weisenberger* v. *State* (1931), 202 Ind. 424, 431, 175 N. E. 238.

The State contends that the involved statute is a proper exercise of the State police power by the Legislature. While much evidence was heard by the trial court, designed to show loss of revenues to the State and incidentally to its Department of Conservation by reason of this law, we do not believe this evidence was required in this case to determine the issue presented by the complaint and answer. It has been well stated that "The general rule is that the federal or state constitution provides the only standard for determining the validity of a statute." The court will "consider only the statute upon which the charge is founded, and the sections of the state constitution with which it is claimed to be in conflict." *Kirtley* v. *State* (1949), 227 Ind. 175, 180, 84 N. E. 2d 712; *Evansville, etc., Ry. Co.* v. *So. Ind. R. E. Corp.*, 231 Ind. 648, 654, 109 N. E. 2d 901; *Weisenberger* v. *State* (1921), 202 Ind. 424, 431, *supra*, but "invalidity of the questioned statute may be shown by things which will be judicially noticed." *Weisenberger* v. *State, supra; Weaver* v. *Palmer Bros. Co.* (1926), 270 U. S. 402, 409, 70 L. Ed. 654. See also *Quong Wing* v. *Kirkendall* (1911), 223 U. S. 59, 64, 56 L. Ed. 350, 352; *Department of Insurance* v. *Schoonover* (1947), 225 Ind. 186, 190.

In Indiana, all legislative authority is vested in the

General Assembly. Ind. Const. Art. 4, Sec. 1. The right to legislate is limited only by the restrictions expressly or impliedly imposed by the state constitution, the federal constitution and the laws and treaties made pursuant thereto. *Kirtley* v. *State* (1949), 227 Ind. 175, 84 N. E. 2d 712, *supra;* *State ex rel. Harrison* v. *Menaugh et al.* (1898), 151 Ind. 260, 266, 51 N. E. 357, *supra; Townsend* v. *State* (1897), 147 Ind. 624, 47 N. E. 19, *supra; Weisenberger* v. *State* (1921), 202 Ind. 424, *supra; Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 674, 80 N. E. 529, 14 L. R. A. (N. S.) 418.

It seems that the questioned statute grants privileges and immunities to one class of citizens, which upon the same terms do not equally belong to all citizens. The General Assembly may not lawfully enact such a law unless it is done in a valid exercise of the police power of the state. Classification may be made and valid laws may be enacted under the police power to protect the public health, public morals, public order, public safety or public welfare. *Kirtley* v. *State* (1949), 227 Ind. 175, 181, 84 N. E. 2d 712, *supra; Department of Insurance* v. *Schoonover* (1947), 225 Ind. 186, *supra; State Board of Barber Examiners* v. *Cloud* (1942), 220 Ind. 552, 567, 44 N. E. 2d 972.

One question presented is: Is former military service a proper classification for a discrimination in legislation relating to taxation or licenses? This question has been answered by a text writer, thus:

". . . In a majority of insances in which the question has been presented, exemption from the payment of occupation or license taxes solely on a basis of war service has been held to violate equality guaranties of the Federal and state Constitutions. In a few cases, however, such an exemption has been upheld as valid. Statutes exempting veterans from the payment of poll

taxes, property taxes, and various other types of taxes or licenses have occasionally been sustained." 12 Am. Jur. Constitutional Law, Sec. 501, p. 183 and many authorities there cited.

As supporting the majority rule see *Marallis* v. *Chicago* (1932), 349 Ill. 422, 429, 182 N. E. 394, 83 A. L. R. 1222 and Anno. p. 1233 *et seq.*; *State* v. *Garbroski* (1900), 111 Iowa 496, 498, 82 N. W. 959, 82 Am. St. Rep. 524, 56 L. R. A. 570; *Commonwealth* v. *Hana* (1907), 195 Mass. 262, 266, and authorities there cited, 81 N. E. 149, 11 L. R. A. (N. S.) 799, 122 Am. St. Rep. 251, 11 Ann. Cas. 514; *State* v. *Whitcom* (1904), 122 Wis. 110, 122, 96 N. W. 468; *State* v. *Shedroi* (1903), 75 Vt. 277, 282, 54 Atl. 1081, 63 L. R. A. 179, 98 Am. St. Rep. 825.

Our court has consistently held that the means used by the General Assembly to protect the public health, morals, order, safety or welfare, must have some reasonable relation to the accomplishment of the end in view. *Blue* v. *Beach et al.* (1900), 155 Ind. 121, 131, 56 N. E. 89; *Fairchild, Pros. Atty.* v. *Schanke et al.* (1953), 232 Ind. 480, 488, 113 N. E. 2d 159; *Kirtley* v. *State, supra,* at page 181. If such a law is enacted by the legislature granting privileges or immunities to a class of citizens and withholding the same from the others and the validity of the law is properly questioned, it then becomes the duty of the courts to review such legislation and determine whether it relates to and is appropriate to secure the object in view. In such an examination the court will looks to the substance of the thing involved. *Blue* v. *Beach et al., supra,* at page 131; *Bruck* v. *State ex rel. Money* (1950), 228 Ind. 189, 198, 199, 91 N. E. 2d 349.

To ascertain the purpose of conservation laws with respect to Indiana wildlife, we may look to the several

laws enacted concerning it. In 1881 the legislature provided for the appointment of a Commissioner of Fisheries. Sec. 2 of that act defined the duties of the Commissioner thus:

"It shall be the duty of said Commissioner to examine the various lakes, rivers, streams and water courses in this State, and ascertain whether they can be rendered more productive in the supply of fish; also what measures are desirable and expedient to effect this object either in propagating and protecting the fish that at present frequent the same, or in the selection and propagation of other species of fish therein (or both) ; said commissioner shall also inquire into and test the best modes of the artificial propagation of fish in the various waters of the State, and shall procure and superintend the procuring of the fish, fish eggs or spawn, as shall be necessary for said waters and the propagation of the same therein." Acts 1881, ch. 53, Sec. 2, page 516, R. S. 1881, Sec. 5725.

At the same session the legislature provided for the protection of wild game, wild birds, and fish by appropriate laws. See Public Offenses. Acts 1881, Chap. 37, Secs. 196 to 210, inclusive, pp. 218, 219, 220. R. S. 1881, Secs. 2105 to 2120 inclusive. When the Act of 1881 authorizing the appointment of a Commissioner of Fisheries and defining his duties (Acts 1881, ch. 53, Sec. 2, *supra*) was repealed by Acts 1899, ch. 31, p. 44, and the appointment of a commissioner of Fisheries and Game was provided for, Sec. 2 of the repealed act was incorporated in the Act of 1899, and the duties of the Commissioner was greatly extended, by causing him, among other things, to give his attention to:

". . . The best methods of preserving and propagating the game birds and song birds now in the State" and to "introduce such varieties of food and game birds, foreign to the State, as may be deemed for the best interest of the people of the State. . . . Said Commissioner shall also see that all laws

for the protection of fish and game are enforced.
. . . "

The commissioner and his deputies were given special authority to make arrests of violators of the fish and game laws by Sec. 4 of the act, and by Sec. 7, the commissioner was given authority to assist in the prosecution of offenders against the fish and game laws.

In 1919, the legislature created "the department of conservation." Division No. 5 of this act, Sec. 19, p. 387, Acts 1919, was entitled "Division of Fish and Game." By that Act all the duties that theretofore had belonged to the Commissioner of Fisheries, or the Commissioner of Fisheries and Game were given to the department of conservation, along with many additional duties and much additional authority. See Sec. 4743 Burns' 1926, Ind. Statutes. Also, Secs. 2779-2861.

By the Acts of 1945, Ch. 353, p. 1705, Sec. 60-701 Burns' 1951 Repl., The Department of Conservation, and the conservation commission were abolished, and Indiana Department of Conservation was created and made a legal entity. Sec. 5, of this act, Sec. 60-703a, Burns' 1951 Repl. transferred all the jurisdiction, authorities, rights, powers, duties, responsibilities, causes of action or defense theretofore vested in "The Department of Conservation" or its director, or the conservation commissioner or its director to the Indiana Department of Conservation and its Director.

A short synopsis of the development of conservation laws in Indiana has been given in order that we may have an idea of the purpose of such laws with respect to "wildlife" generally in the state of Indiana. It seems safe to say that, from the beginning, the purpose has been to protect and propagate such life, for the benefit of the people generally in Indiana and elsewhere. Almost within our generation

we have witnessed the extermination of the passenger pidgeon, the Carolina parakeet and the drummer pheasant. The policy of the state probably has been influenced by these experiences.

The present resident yearly license fee to hunt, trap and fish in Indiana is two dollars, Sec. 11-1403 Burns' 1942 Repl. Suppl.

There are many other license fees provided for by Indiana law for the taking of wild game and fish in many different ways. And it is expressly provided by law that:

". . . No monies accruing to the state of Indiana from license fees paid by hunters shall be diverted for any other purpose than the administration of the division of fish and game of the department of conservation." Sec. 11-912 Burns' 1942 Repl. And: "Any and all license fees and any and all monies taxed and collected by, or coming into the hands of the director pursuant to, or by virtue of any of the provisions of this act shall be paid into the state treasury and shall become a part of the fish and game protection and propagation fund, and said fund shall be expended in the propagation of, protection, and purchase of fish, frogs, mussels, wild birds, wild animals, or game, and all other expenses in connection therewith." Sec. 11-1803, Burns' 1942 Repl.

We judicially know that a high percent of persons of hunting age in Indiana and elsewhere in the nation are ex-members of the armed forces of America, and that to exempt them from paying the fee for a hunting and fishing license will have a tendency to deplete the fund available for the protection and propagation of fish, game, wild birds, etc.; and thereby to retard and delay conservation objectives. So the question is posed: Is a legislative act that tends to produce this result an act that will protect the public health, morals, order,

safety, or welfare? We think this question must be answered in the negative. Such legislation could not have even a tendency to protect either public health, morals, order, safety or welfare. The legislature could with equal propriety exempt persons from procuring a license to sell intoxicating liquor, practice medicine, dentistry, veterinary, and every line of human endeavor for which a license is now or may be hereafter required. Such a result would be destructive of the purposes authorizing police power legislation. By no stretch of the imagination could it be helpful thereto.

A careful examination of the statute involved indicates that it was the legislative intent to make a small state gift to the indicated donees, at the expense of state conservation. It authorizes the destruction of wildlife without provision for its propagation and protection. We cannot believe that the indicated beneficiaries would want that to occur. In other words while they may enjoy hunting and fishing, the pleasure would disappear if there was no game or fish to take.

The involved statute, Sec. 11-1424 Burns' 1942 Cumulative Supplement, Indiana Acts 1945, Chapter 93, pp. 209, 210, 211, is in contravention of Article 1, Section 23 of the Constitution of Indiana, and of Section 1, of the Fourteenth Amendment of the Constitution of the United States.

For the reasons given the judgment is reversed, with instructions to sustain the motion for new trial.

Emmert, J., dissenting with opinion, to follow.

### DISSENTING OPINION

EMMERT, J.—The majority opinion and its reasoning open up a Pandora's box of constitutional doubts as to the validity of many statutes in Indiana which were enacted by the General Assembly in appreciation of the

patriotic sacrifices made by the men and women in the armed forces during a time of national peril. It applies a rule of strict construction in a matter affecting veterans when, as stated by this court in *State* v. *Dudley* (1910), 173 Ind. 633, 635, 91 N. E. 228, to invoke such a rule "is unpatriotic and impolitic." Under the reasoning of the majority opinion of the Veterans Bonus Law, Ch. 277, Acts 1949, and amendments thereto, §59-1401, Burns' 1951 Replacement, *et seq.*, which was approved by the voters of this state in a referendum (870,195 votes yes, 250,318 votes no), is of doubtful constitutional validity, for with equal force it could be asserted that it grants to a "class of citizens, privileges or immunities which, upon the same terms," do "not equally belong to all citizens." Section 23, Article 1, Constitution of Indiana.

From Colonial times it has been established legislative policy to grant to veterans of certain wars or campaigns material benefits in appreciation of their military services. On January 2, 1781, the General Assembly of the Commonwealth of Virginia enacted a statute granting to the veterans of General Clark's Illinois campaign, which accomplished the capture of Fort Sackville at Vincennes, 150,000 acres of land located in what is now Clark, Floyd and Scott Counties of this state. Wm. H. English, Conquest of the Country Northwest of the River Ohio and Life of General George Rogers Clark, Vol. 2, Ch. XXI, *et seq. Henthorn* v. *Doe* (1822), 1 Blackf. 157.[1] General

1. Even after Indiana became a state this court recognized certain jurisdiction of Virginia concerning this grant. "Congress has never attempted to make any regulation respecting the lands in this grant, nor have the United States, in any instance, claimed the right to legislate on the subject, or in any manner to interfere with Virginia respecting the primary disposal of the soil. If this is a fair construction of the compact, Virginia retained, and still retains the sole and exclusive right of legislation, so far as respects the transfer from the Government to individual claimants of the legal title to lands in the Illinois Grant; and with respect to these lands, the acts of the General Assembly

Clark conducted other campaigns against our common enemies in the Northwest Territory during the Revolution, after which the veterans thereof were not so compensated; so from the earliest times in this state it has always been assumed that it was a proper legislative function to classify veterans by reason of wars, or by reason of particular campaigns.

The General Assembly of Indiana, in accord with the ancient legislative policy of this state, has enacted many statutes for the benefit of veterans. The reasoning of the majority opinion cast a cloud of unconstitutionality over all of these, a partial list being as follows:

Renewal of Barber Certificate. §63-3138, Burns' 1951 Replacement.

Burial Allowance. §59-1009, Burns' 1951 Replacement.

Certificate of Birth or Death. §35-2102, Burns' 1949 Replacement.

Certified Copies of Public Records. §59-1018, Burns' 1951 Replacement.

Tuition Exemption to State Colleges and Universities. §28-5732, Burns' 1948 Replacement.

Disability Exemption on Taxable Property Assessment. §64-205, Burns' 1951 Replacement.

Recording of Discharge. §59-1004, Burns' 1951 Replacement.

Ten percent Disability Tax Exemption. §64-223, Burns' 1951 Replacement.

Preferential Employment by Fire Departments. §48-6125 (a), Burns' 1950 Replacement.

Special Automobile License Plates and Parking Privileges for Disabled Veterans. §§47-2626 to 47-2629, Burns' 1952 Replacement.

Tenure of Employment in Second Class Cities. §48-6610, Burns' 1950 Replacement.

of Virginia have the same force and authority as the acts of Congress have with respect to the other lands in these states." *Henthorn* v. *Doe* (1822), 1 Blackf. 157, 161.

Equal Veterans Rights for Nurses. §59-1008, Burns' 1951 Replacement.

Free Vending License. §62-510, Burns' 1952 Replacement.

Gross Income Tax Exemption During Service. §64-2606(a), Burns' 1951 Replacement (Supp.).

Poll Tax Exemption for Disabled Veterans. §64-220, Burns' 1951 Replacement.

Civil Service Appointments. §49-301, Burns' 1951 Replacement.

Employment Preference Under Personnel Act. §60-1319, Burns' 1951 Replacement.

School Privileges for Children of Members of the Armed Forces. §28-3716, Burns' 1948 Replacement.

Preservation of Teachers Contract Rights During Service. §28-4322, Burns' 1948 Replacement.

Additional Inheritance Tax Exemption for Veterans' Estate Dying in Service. Chapter 103, Acts 1945.

World War II Veterans Bonus Act. Chapter 277, Acts 1949, and amendments, §59-1401, *et seq.*, Burns' 1951 Replacement.

Armed Forces Mortgage Exemption. §64-227, Burns' 1951 Replacement.

The eightieth session of the General Assembly enacted Ch. 21 of the 1937 Acts, which was a comprehensive law on fish and game and the taking thereof, §11-1424, Burns' 1942 Replacement (Supp.), which provides for the issuance of free permits to hunt, trap and fish to veterans of the Civil War, the Spanish American War, the Philippine Insurrection, The Mexican Border Expedition in 1916 and 1917, World War I and World War II. The exemption statute required each permittee to have his permit upon his person when hunting, trapping or fishing. There is nothing in the statutes which gives any of the veterans a right to violate any law with respect to the preservation of fish or game, and their permits are subject to revocation under the same terms

applicable to any other licensee or permittee. No veteran is authorized to hunt, trap or fish during a closed season, or to take any fish or game in an unlawful manner. There can be no unreasonable classification because of these provisions.

However, §51 of the 1937 Act, §11-1803, Burns' 1942 Replacement, provides that all license fees be paid into the state treasury to become a part of the fish and game protection and propagation fund, to be used "in the propagation of, protection, and purchase of fish, frogs, mussels, wild birds, wild animals, or game, and all other expenses connected therewith." Rhetorical paragraph 13 of the appellant's complaint states as follows:

"That a Tax of the United States Government (U. S. C. A. Title 26, Sections 3406 and 3407) is imposed upon the manufacture of hunting and fishing equipment. That an amount equal to these monies for each fiscal year *are* apportioned to the States, including the State of Indiana, for the propagation and preservation of fish and game and distributed upon the basis of (1) size of the State (2) number of licenses sold, and that this plaintiff has purchased both hunting and fishing equipment within the past six (6) months and thus paid such Federal Tax thereon and that he is deprived, as other hunters and fishermen in this State, and denied his fair and proper share of the amount being apportioned as aforesaid for the reason that the Federal Government does not consider the issuance of a free permit as a license in distributing said funds, (Title 16, Sec. 777 *et seq.* and 669 *et seq.*) ; and accordingly the issuance of such free permits causes the amount spent on such preservation and propagation of fish and game in the State of Indiana by the United States Government to be less than if such free permits were not issued. That these circumstances deny to this plaintiff, the equal protection of law, takes his property without due process of law and grants a privilege and immunity to certain citizens of this State and Country, all in conflict with the Constitutional provisions set out in Rhetorical Paragraph 11 above."

In other words, the argument is presented that because the State of Indiana gets less federal aid the law is unconstitutional. The short answer to that is that if the legislature chooses to place considerations of patriotism higher and of greater value than the protection and purchase of "fish, frogs, mussels, wild birds, wild animals, or game," it has the constitutional right to do so.

This court has the power to declare constitutional acts unconstitutional, but it does not have the right to do so. Unless an act is clearly unconstitutional, the doubt must be resolved in favor of its constitutionality. It is not for this court to substitute its judgment as to what may be good, wise or just legislation for that of the legislature, and this temptation is ever present in the consideration of the constitutionality of every statute under attack. Stating a well recognized rule, and then proceeding to ignore it cannot justify the result of the majority opinion. As was stated by Judge Frazer in *Brown* v. *Buzan* (1865), 24 Ind. 194, 196, 197:

> "The constitution is paramount to any statute, and whenever the two are in conflict the latter must be held void. But where it is not clear that such conflict exists, the court must not undertake to annul the statute. This rule is well settled, and it is founded in unquestionable wisdom. The apprehension sometimes, though rarely, expressed, that this rule is vicious, and constantly tends toward the destruction of popular liberty, by gradually destroying the constitutional limitations of legislative power, results from a failure to comprehend the character of our forms of government, and the fundamental basis upon which they rest. The legislature is peculiarly under the control of the popular will. It is liable to be changed, at short intervals, by elections. Its errors can, therefore, be quickly cured. The courts are more remote from the reach of the people. If we, by following our doubts, in the absence of clear convictions, shall abridge the just

authority of the legislature, there is no remedy for six years. Thus, to whatever extent this court might err, in denying the rightful authority of the law-making department, we would chain that authority, for a long period, at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can sooner relieve themselves of its mistakes. Herein is a sufficient reason that the courts should never strike down a statute, unless its conflict with the constitution is clear. Then, too, the judiciary ought to accord to the legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the constitution, and, also, a high capacity to judge of its meaning. Hence, its action is entitled to a respect which should beget caution in attempting to set it aside. This, with that corresponding caution of the legislature, in the exercise of doubtful powers, which the oath of office naturally excites in conscientious men, would render the judicial sentence of nullity upon legislative action as rare a thing as it ought to be, and secure that harmonious co-operation of the two departments, and that independence of both, which are essential to good government."

It would be futile to try to reconcile all the cases from other jurisdictions involving veterans' benefits, yet the better reasoned cases clearly recognize the rule that when a veteran enlisted in the Armed Forces of the United States, he not only served the federal government but also his state. *State ex rel. Atwood* v. *Johnson* (1919), 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617 and authorities cited therein.

In *Veterans' Welfare Board* v. *Riley* (1922), 189 Cal. 159, 168, 208 Pac. 678, 22 A. L. R. 1531, the Supreme Court of California considered the constitutional validity of the Veterans' Education Act of California,

which provided educational aid to veterans of World War I by a payment of the cost of transportation to educational institutions, annual tuition fees, costs of books and supplies, and $40.00 per month for living expenses. In upholding the Act the court said:

"However, in the case at bar the government receives the highly important advantage of the stimulation of patriotism by a definite recognition of the magnificent, unhesitating, and courageous service of the World War veterans, whose valor and spirit turned the tide of history in favor of our form of government, based, as it is, upon the fundamental principles of the freedom and equality of all men and upon their equal right to participate in the government and to the advantages of such government. This advantage derived from the stimulation of patriotism is sufficient to justify outright gifts of money by way of bonus and pension, and is universally recognized as a sufficient ground for such expenditures."

The realities of modern military service make absurd the holding in *State* v. *Shedroi* (1903), 75 Vt. 277, 54 Atl. 1081, 63 L. R. A. 179, 98 Am. St. Rep. 825, that military service furnishes no basis for classification. In *Farley* v. *Watt* (1933), 165 Okla. 6, 7, 8, 23 P. 2d 687, 689, the Supreme Court of Oklahoma, in disagreeing with the so-called Vermont rule, said:

"We do not agree with this view. In the first place, the soldiers of the late war were selected from a particular class. It was a governmental classification. The government selected male citizens of a particular age. The vast majority of those who served were between the ages of 18 and 31. They were then in the formative stages of their lives. Many of them when discharged, did not, as the Vermont court said, become a part of the general mass of mankind. For far too many there was no Armistice, there was no discharge, but simply the padded cell, the hospital cot, the white cross. The war definitely interrupted the studies, the vocations,

the businesses of those young men who were making essential preparations for occupational or professional careers. Those who were classified and called away were handicapped not only by an interrupted preparation, but by a tremendous inflation of values which met them upon their return. They were handicapped by physical disability incident to their governmental service and in wealth and opportunity. They constituted a distinct class distinguished from the mass of society—a class created by deprivation of equal opportunity in civil pursuits at home and marked by disability incident to defense of their country abroad. Marallis v. Chicago, 349 Ill. 422, 182 N. E. 394, 83 A. L. R. 1222."

The court could well have added that time does not cure everything for the veterans. Even those who returned without being wounded or diseased bear the hidden scars in mind and body which will never change. Few escaped a permanent change of personality when suddenly taken from civilian life and necessarily trained to kill by every means of violence permitted by the rule of warfare. Nor will they ever regain the depletion of their reserve of nervous and physical energy, nor can they ever fully recover from the heavy strains of training or battle. Excessive strain, according to modern medical science, may be responsible for much undue shortening of the life span. To hold that military service *per se* does not furnish an adequate and reasonable basis for classification is to consider modern warfare no different than that waged before the Napoleonic wars, when its practice was more gentlemanly than aggressive.

There has never been any doubt as to the validity of federal pensions. "Power to grant pensions is not controverted, nor can it well be, as it was exercised by the States and by the Continental Congress during the war of the Revolution; and the exercise of the power is

coeval with the organization of the government under the present Constitution, and has been continued without interruption or question to the present time." *United States* v. *Hall* (1878), 98 U. S. 343, 346, 25 L. Ed. 180.

If then the reasoning of the majority opinion is valid, then any resident of Indiana who had a gross income over $1,000 a year when the bonus surtax was in effect, could claim that the Indiana Bonus Act was unconstitutional, because he had to pay tax for the benefit of a veteran of World War II. A veteran of World War I could assert that he was discriminated against because he never received any bonus compensation from Indiana. A veteran of the Korean war, who paid the surtax, could equally assert that he was discriminated against because he was as much entitled to a bonus as World War II veterans.

There is no legal reason or basis in experience for putting a veteran's preference on a different basis than a pension act. As was stated in *State ex rel. Reclamation Board* v. *Clausen* (1920), 110 Wash. 525, 542, 188 Pac. 538, 14 A. L. R. 1133:

"Some contention is made that the law is unconstitutional in that it violates the equal privileges and immunities guaranty of our constitution, because it contemplates, in the disposition of the lands, the giving of preference rights to soldiers. All arguments that could be made against the law upon this ground could, with equal force, be made against every pension law that was ever enacted by the Congress of the United States, or any of the states. Manifestly this contention is without merit."

With equal persuasion the same logic applies to a veteran's exemption, such as involved in the appeal at bar.

The basic error of the majority opinion lies in its unwarranted assumption that, under the conservation act of 1937 and its amendments, the public health,

morals, order, safety or welfare could only be protected by the protection and purchase of "fish, frogs, mussels, wild birds, wild animals, or game." But the public welfare also includes the promotion and appreciation of patriotism.[2] What greater patriotic service can be found than the defense of our state and nation in time of peril? There is no constitutional barrier prohibiting one act from regulating hunting, trapping and fishing, and at the same time rewarding patriotic service, so long as the title is broad enough to cover both objects.

The statutory price for a yearly license to hunt, trap and fish is $2.00. If the General Assembly, by statute, had provided that each veteran buying such a permit, be reimbursed from the general fund the sum of $2.00 for each license purchased, the lawsuit would never have been commenced. Such reimbursement would not be materially different than a bonus. But the federal aid, which was the motivating cause for this litigation, would have been forthcoming. The state gives the veteran a piece of paper in one case, worth $2.00 a year, and, in another case under the Bonus Act $400 or $500. Simply because the General Assembly chose to accomplish a public purpose by way of an exemption in obtaining the license,

---

2. "Under the act [Wisconsin Bonus Act] the money appropriated as awarded 'as a token of appreciation of the character and spirit of their patriotic service, and to perpetuate such appreciation as a part of the history of Wisconsin.'" Page 230.

". . . . .

"The gratitude due the soldier is no idle sentiment. He who leaves his home and kindred, enters upon the trials and hardships of a soldier, risks his life upon the battle-field for the good of his country, is certainly entitled to the gratitude of all citizens." Page 233.

". . . . .

"We feel warranted in holding upon principle and authority that the purpose of the act is a public purpose within the meaning of the constitution." Pages 234, 235.

*State ex rel. Atwood* v. *Johnson* (1919), 170 Wis. 218, 175 N. W. 589, 7 A.L.R. 1617.

the act is unconstitutional, because Indiana gets no federal aid by this method.

The trend of veterans' legislation since World War II, both in the states and in Congress, has been to grant more liberal benefits. Financial need was not a requirement for receipt of the Indiana bonus. Wealth or financial funds had nothing to do with a veteran's eligibility to receive financial assistance under the G. I. Bill of Rights (Title 38, U. S. C. A.) for college or professional education. No patriotic citizen objected to additional taxes to give a veteran financial help for such additional education, even though in many instances the veteran or his parents were wealthy, or amply able to provide the entire cost. So far as my research extends, no case can be found where any party had the temerity to suggest the G. I. Bill of Rights was unconstitutional, or not in the interest of the public welfare. But a petty $2.00 license fee is of great moment, and a veterans' exemption must be struck down in the interests of "fish, frogs, mussels, wild birds, wild animals, or game." This court could well have applied the maxim, *"de minimis non curat lex."*

## ON REHEARING

HENLEY, C. J.—The Indiana General Assembly in its 1945 Session passed an act which became law, one provision of which exempted former members of the armed services of the United States from paying any consideration for hunting and fishing licenses and providing they be admitted to that class free. The act reads as follows:

"(a)   The director is hereby authorized and required to prescribe and furnish permits to hunt, trap and fish in this state to honorably discharged soldiers, sailors, marines, nurses, or women's corps of the army, navy and marines, who served in the army, navy, or marine corps of the United States during the Civil War, the War with Spain, the Phil-

ippine Insurrection, the service on the Mexican Border during 1916 and 1917, the World War I or the World War II, who, at the time of application for such permit, and who for a full period of six (6) months next preceding the date of application, where (were) bona fide residents of this state.

"(b) The form of such permits and the application therefor shall be prescribed by the director. Such permits shall be issued in each county of the state by the clerk of the circuit court, without charge to permittee, only to such soldiers, sailors, marines, nurses, and women's corps of the army, navy and marines, above mentioned who are, at the time of making application, bona fide residents of such county; except that in the county of Marion, such permits shall be issued only by the director, without charge to permittee, to said soldiers, sailors, marines, nurses, and women's corps of the army, navy and marines only who are bona fide residents of that county.

" . . ."

§11-1424, Burns, 1953 Cum. Supp., Acts 1945, ch. 93, §1, p. 209.

The appellant, a non-veteran, brought this action in Marion County, venued to Hancock County, praying in an amended complaint a declaratory judgment that the legislative enactment is void as violative of Art. 1, §23 of the Constitution of the State of Indiana, which reads as follows:

"The General Assembly shall not grant to any citizens, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

The appellant also contends in his said complaint that the act involved also violates Section 1 of the Fourteenth Amendment of the Constitution of the United States, which provides:

". . . No state shall make or enforce any law which shall deny . . . to any person within its jurisdiction the equal protection of the laws."

The trial court held in favor of the defendant-appellees and against the plaintiff-appellant, whereupon plaintiff-appellant, upon overruling of his new trial motion, prayed and perfected this appeal. His assignment of error and briefs, as well as the briefs of several organizations of veterans, raise the single question of whether the act involved violates the Indiana and United States Constitutions, or either of them.

This court, by an opinion written by Gilkison, C. J., prior to his untimely death and concurred in by three other then Judges of this court (with dissent by Emmert, J.), held that the act involved is unconstitutional and reversed the judgment below for that reason.

Appellees filed a petition for rehearing and, since a majority of the present Judges had assumed the bench subsequent to the judgment of reversal, a re-argument was held and the cause is now ready for final decision on the petition for rehearing filed by appellees. The question now before this court is the same on which confronted Chief Justice Gilkison and was decided by him and three of his then associate Judges.

We recognize the rule that in passing on the question of whether an act is constitutional we may indulge in presumptions in favor of its validity, and we have applied that rule in our present consideration. *The State ex rel. Harrison v. Menaugh et al.* (1898), 151 Ind. 260, 266, 51 N. E. 117, 51 N. E. 357; *Kirtley v. State* (1949), 227 Ind. 175, 179, 84 N. E. 2d 712. The right to legislate is vested exclusively in the General Assembly. Art. 4, §1 of the Constitution of the State of Indiana. Under its broad police powers to protect the public health, morals, order, safety and welfare, the General Assembly can go to substantial lengths in ordinary affairs of life and conduct. However, these legislative rights are always limited by the limitations of the state and federal

constitutions. *Kirtley* v. *State* (1949), 227 Ind. 175, 179, *supra; The State ex rel. Harrison* v. *Menaugh et al.* (1898), 151 Ind. 260, *supra; Townsend* v. *The State* (1897), 147 Ind. 624, 47 N. E. 19; *Weisenberger* v. *State* (1931), 202 Ind. 424, 175 N. E. 238; *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 80 N. E. 529, 14 L. R. A. (N. S.) 418.

Appellees, supported by the Indiana Department of the American Legion, Veterans of Foreign Wars District of Indiana, and Disabled American Veterans, Department of Indiana, Inc., each of which has filed a brief on the petition for rehearing as *amicus curiae,* have in such briefs stressed the proposition that a classification of veterans for special reward or consideration is constitutional and proper. We have no quarrel with the statement that in many cases the classification of veterans for special rewards or consideration for services rendered their country is constitutional and proper. Military service does furnish a proper basis for legislative classification but only when confined within the limits of the Constitution.

It is of great importance to the peace and prosperity of the state and nation that men and women should be returned from military service in an orderly way to self-supporting occupations, and that those things of which they were deprived by reason of such service be restored to them in as great a measure as possible. However, military service does not relieve a man or woman veteran from the restrictions and limitations imposed upon all the citizens of the state by our Constitution.

Indiana and practically all other states in the union from which citizens have enlisted or been drafted for military service have given to returned veterans, both men and women, bonuses and other gratuities and pref-

erential treatment as compensation or rewards for services rendered. Such considerations have been valid and proper because the acts granting them did not exceed those constitutional limitations established for the welfare and protection of all of the people. The legislature, when granting compensation or special considerations to veterans, is required to act within the limits of the Constitution.

There is a clear distinction between the case at bar and those cases which involve the granting of bonuses or other considerations as compensation or rewards for services rendered. The whole purpose of such acts is to assist the veterans in readjusting himself to civilian life. The purpose of the act here in question has been concisely stated by appellees themselves in their brief as follows:

"The statute in question clearly shows that its purpose is for the protection of fish and game for the benefit of the citizens of the state."

The title of the Act (ch. 21, Acts 1937, as amended), of which the section here under consideration is a part, is as follows:

"An Act concerning fish, frogs, mussels, game, wild birds and wild animals and offenses relating thereto."

Section 10, Acts 1937, ch. 21, as amended, being §11-1401, Burns' 1942 Replacement, provides:

"It shall be unlawful for any person to fish in, or take, catch, or attempt to take or catch, any fish from the waters of this state, or to hunt, shoot, take, pursue, or trap any wild bird or wild animal in this state, without first procuring a license therefor, as in this act provided, unless such person shall be by this act specifically exempt from so doing."

To show the persistent legislative intent zealously to

guard the state's wildlife it is only necessary to examine certain conservation statutes beginning as early as 1881, excerpts of which are as follows:

"It shall be the duty of said Commissioner to examine the various lakes, rivers, streams and water courses in this State, and ascertain whether they can be rendered more productive in the supply of fish; also what measures are desirable and expedient to effect this object either in propagating and protecting the fish that at present frequent the same, or in the selection and propagation of other species of fish therein (or both) ; said Commissioner shall also inquire into and test the best modes of the artificial propagation of fish in the various waters of the State, and shall procure and superintend the procuring of the fish, fish eggs or spawn, as shall be necessary for said waters and the propagation of the same therein." Acts 1881, ch. 53, §2, p. 516, R. S. 1881, §5725.

". . . The best methods of preserving and propagating the game birds and song birds now in the State and shall introduce such varieties of food and Game birds, foreign to the State, as may be deemed for the best interests of the people of the State. . . . Said Commissioner shall also see that all laws for the protection of fish and game are enforced . . . ." Acts 1899, ch. 31, §2, p. 44.

". . . No monies accruing to the state of Indiana from license fees paid by hunters shall be diverted for any other purpose than the administration of the division of fish and game of the department of conservation." §11-912 Burns' 1942 Replacement, Acts 1939, ch. 101, §1, p. 517.

"Any and all license fees and any and all monies taxed and collected by, or coming into the hands of the director pursuant to, or by virtue of any of the provisions of this act shall be paid into the state treasury and shall become a part of the fish and game protection and propagation fund, and said fund shall be expended in the propagation of, protection, and purchase of fish, frogs, mussels, wild birds, wild animals, or game, and all other expenses in connection therewith." §11-1803, Burns' 1942 Replacement, Acts 1937, ch. 21, §151, p. 64.

Section 12 of ch. 21, *supra,* as amended by Acts of 1951, ch. 286, §1, 879, being §11-1403, Burns' 1953 Cum. Supp., provides that the licenses therein listed shall be issued "upon the payment of the following respective license fees for the same."

See §11-1403, Burns' 1953 Cum. Supp. for list of fees charged for various grades of licenses.

Subsection (d) of §13, of ch. 21, Acts 1937, being §11-1404, Burns' 1942 Replacement, *supra,* provides that "All monies received into the hands of the director from the sale of licenses shall be deposited in the state treasury as a part of the fish and game protection and propagation fund."

Title to wild game and fish is in the state in its sovereign capacity as the trustee of all the citizens in common. No individual has a property right in fish or game while in its natural state. *Smith* v. *State* (1900), 155 Ind. 611, 58 N. E. 1044.

The taking of fish or the killing of game is not a right but is a privilege granted by the state under such conditions as it may see fit to impose. *Smith* v. *State, supra.*

Under ch. 21, *supra,* the State of Indiana has granted to her citizens the privilege of hunting and fishing upon the conditions:

(1) That certain game be killed only during the periods and in the amount specified in the act;

(2) That the time of fishing and the daily catch be limited as provided in the act;

(3) That any person desiring to avail himself of the privilege of hunting or fishing procure a license therefor by paying to the duly authorized issuing agent the license fee provided in the act.

The clear purpose of the license fee and the legislative intent behind it is to provide funds for the protection and propagation of fish and game. §11-1404, Burns' 1953 Cum. Supp., *supra*. May the legislature extend the privilege of hunting and fishing to veterans without requiring them to comply with the condition that every person who desires to exercise the privilege of hunting and fishing shall, in return for such privilege, pay as a license fee a contribution to the fish and game protection and propagation fund? In other words, may this privilege be extended to veterans without requiring them to pay anything toward the expense of regulation, protection, propagation and replenishment of fish and game as non-veterans are required to do? We think not, without a plain violation of Art. 1, §23 of the Constitution of the State of Indiana, set out hereinbefore.

This court, in *Fairchild, Prosecuting Atty., etc.* v. *Schanke et al.* (1953), 232 Ind. 480, 487, 113 N. E. 2d 159, reaffirmed the rule pertaining to legislative classification as limited by Art. 1, §23, *supra*, as stated in *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 674, *supra*, as follows:

"The legislature may make a classification for legislative purposes, but it must have some reasonable basis upon which to stand. It is evident that differences which would serve for a classification for some purposes would furnish no reason for a classification for legislative purposes. Such legislation must not only operate equally upon all within the class, but the classification must furnish a reason for and justify the making of the class; that is, the reason for the classification must inhere in the subject-matter, and rest upon some reason which is natural and substantial, and not artificial. Not only must the classification treat all brought under its influence alike, under the same conditions, but it must em-

brace all within the class to which it is naturally related. Neither mere isolation nor arbitrary selection is proper classification. (Citing numerous authorities.)"

The classification attempted by §11-1424, *supra,* must be considered with reference to the subject-matter of ch. 21 of the Acts of 1937, as amended. When this act is considered with its amendments and supplementary acts, it must be conceded that the subject-matter of the act is fish and game, and its purpose is their conservation and propagation for the benefit of all the citizens of the state. Is there any distinction between a citizen of the state who is a veteran and one who is a non-veteran, in the manner and results of catching fish and hunting wild game? Would a citizen with former military service catch less fish or kill less game than one without military service? Is there any reason, with reference to the protection and propagation of fish and game, why a citizen who has had military service should be exempt from contributing to the fund for the conservation and replenishment of the fish and game supply of the state, while another citizen who catches no more fish or kills no more game during the open season, but who was not in military service, must pay for the privilege of fishing and hunting and thereby contribute to such fund?

No valid reason has been furnished us either by appellees or any of the *amicus curiae,* nor have we been able to find any on our own account. Can it be said that military service and the receipt of an honorable discharge bear any relation to the conservation and propagation of fish and game?

There is no substantial distinction between the present conditions and circumstances of veterans in the attempted classification here in question and those of

other citizens of Indiana in relation to the protection and conservation of fish and game. In fact, as relates to the subject-matter of the act (ch. 21, *supra*) they are all of the same class, i.e., citizens interested in fishing and hunting and in the protection, preservation and propagation of fish and game.

The classification here attempted is so clearly not based upon a substantial distinction with reference to the subject-matter of the fish and game act (ch. 21, Acts 1937 as amended, *supra*) that we deem it unnecessary to prolong this opinion with further discussion of the question.

It is also suggested on rehearing that the attempted classification here should be sustained because bonus legislation has, in many states, "generally been held constitutional on the theory that the tax provided by the statute for the payment of the bonus was for a public purpose." There is no question relating to a tax for the payment of a bonus involved in the case now before us, and the authority cited by *amicus curiae* lends no support to their position. Anyway, the public purpose of the act of which ch. 21, *supra,* is a part, is the protection, preservation and propagation of game. The exemption allowed tends to increase the take and catch of fish and game and at the same time reduce the funds for protection, preservation and propagation of wild life. The provisions of ch. 21, *supra,* are therefore artificial, unreasonable and in direct conflict with the purpose of the act. Such attempted classification was not for a public purpose and for these reasons is clearly unconstitutional.

War veterans patriotically risked life, limb and liberty for the principles of constitutional democracy. Their solemn reflection on the issue of this case will surely result in the satisfaction that by sacrificing the

benefits of free hunting and fishing they are reaffirming an established broad general fundamental constitutional safeguard, transcending their loss of free licenses.

The petition for rehearing is denied.

Bobbitt, J., concurs.

Achor, J., concurs with opinion to follow.

Emmert, J., dissents with opinion in which Levine, J., concurs.

CONCURRING OPINION ON PETITION FOR REHEARING

ACHOR, J.—The feeling of deep appreciation which we hold for the men and women who have sacrificed both financially and physically for our country in time of war, particularly those who bear the scars of battle, as contrasted with the trivial amount involved in a single fee for a hunting and fishing license, has made a deliberate consideration of the issue in this case difficult. It is understandable that many arguments have been injected which are extraneous to the issue involved. These have served to confuse rather than clarify the issue. Therefore, it occurs to me that some additional statement in support of the opinion is meritorious.

In the first place, it has been asserted that this court, by nullifying §11-1424, Burns' 1942 Repl. (1953 Supp.), Acts 1943, ch. 266, §1, p. 757, 1945, ch. 93, §1, p. 209, has improperly concerned itself with a matter of legislative policy and injected itself into a field reserved to the legislature as a co-equal branch of the government. In support of this contention, stress has been placed upon statements by this court that "it is within the province of the legislature in the first instance to determine what classification is just and reasonable in view of the purpose to be attained," *Martin* v. *Loula* (1935), 208 Ind. 346, 354, 194 N. E. 178, 195 N. E. 881, and that "The desirability, or need for legislation

is entirely for the legislature to determine. The question of its wisdom in adopting a classification is a matter of no concern to the courts." *State* v. *Griffin* (1948), 226 Ind. 279, 288, 79 N. E. 2d 537.

However, there is no issue upon the subject. Admittedly, it is not within the province of this court to consider the mere "desirability" or "wisdom" of the laws passed by the legislature. However, it is equally true that it is not within the province of this court to consider the desirability or wisdom of the express provisions of the Constitution of Indiana or the Constitution of the United States. They are the supreme law of the land. Under the Constitution it is our *responsibility,* as a co-equal branch of the government, to accept these Constitutions as written and to determine whether or not the acts of the legislature are *permissible* within their express terms. In doing so, we are not usurping a legislative function.

*Equality of all men before the law* is one of the most basic concepts of our democratic way of life. The right is not only based upon constitutional guarantees but we have declared it to be "self-evident that all men are *created* equal." We are here concerned with a statute which grants an unequal privilege to a class of citizens. We are *required* to determine the constitutionality of that law.

When faced with the same responsibility, the Supreme Court of the United States, in holding a statute unconstitutional, stated: *"No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government. . . ."* *Connolly* v. *Union Sewer Pipe Co.* (1901), 184 U. S. 540, 560, 22 S. Ct. 431. Significantly, the oath of every judge of Indiana is: "I will . . .

support the Constitution of the United States and the Constitution of the State of Indiana . . . to the best of my skill and ability, so help me God." It is this responsibility which we have exercised in this case.

Secondly, there has been much discussion in support of the fact that military service in the armed forces of the United States constitutes a legitimate basis upon which to support laws for the benefit of veterans as a class. See *State ex rel. Hart* v. *Clausen* (1921), 113 Wash. 570, 194 P. 793, 13 A. L. R. 580; *State ex rel.* v. *Yelle* (1950), 36 Wash 2d 192, 217 P. 2d 337. See also: *Farley* v. *Watt* (1933), 165 Okla. 6, 23 P. 2d 687. We quite agree that veterans are a "class distinct" and that they are deserving of special consideration for purposes related to their military service. There is no issue upon that subject in this case.

Finally, it is asserted that the decision holding the statute before us unconstitutional casts a "doubt of unconstitutionality" upon all legislation for the benefit of veterans as a class.

Attention is called to the fact that at present courts have uniformly held that bonuses and certain exemptions from taxation made to veterans as a class are proper, and that to this extent our courts have liberally construed the constitutional mandates of our State and Federal Constitutions[1] against the granting of unequal privileges and immunities to our citizens. Appellee and *amicus curiae,* for the purpose of bringing this case within the precedent of the foregoing cases, argue that the license fee for hunting and fishing, authorized in §11-1403, Burns' 1942 Repl. (1953 Supp.), Acts 1939, ch. 118, §1, p. 571, 1951, ch. 286, §1, p. 879, is merely a tax and that since §11-1424, *supra,* of the Act does

---

1.  Art. 1, §23, Constitution of the State of Indiana, §1 of the Fourteenth Amendment of the Constitution of the United States.

no more than exempt veterans from the payment of such tax, that therefore the statute which provides for the exemption is also valid. They asserted that if, on the contrary, the government may not exempt veterans from the payment of the "tax" for the privilege of hunting and fishing, which privilege belongs to all the people, it would reasonably follow that the government may not give to veterans public lands or public funds (by way of bonuses, etc.), which also belong to all the people, and may not exempt veterans from the payment of certain taxes, which legislation up to now has been accepted as valid. This highly provocative assertion warrants our careful consideration.

The above assertion, although plausible on its face, does not withstand solemn and deliberate consideration. Is the license fee for hunting and fishing merely a tax from which veterans may be properly exempt? The answer is dependent upon whether the purpose of the collection is primarily (1) to raise public funds or whether such payment is primarily (2) a limitation upon and condition precedent to the exercise of a privilege. The fallacy of the appellee's argument lies in the fact that clearly the license fee required by the Act is not a mere tax for the purpose of raising public funds. Both §11-1403, *supra,* which provides for the payment of the license fee, and §11-1424, *supra,* which exempts veterans from such payment, are integral parts of the Conservation Act, §11-1401, Burns' 1942 Repl., Acts 1937, ch. 21, §10, p. 64, et seq. *The admitted purpose of the Act is "the protection and propagation of fish and game for the benefit of all the people."* The license fee is a medium necessary and directly related to the accomplishment of the purpose of the Act. It provides funds for the exclusive purpose of conserving and propagating wildlife and further promotes the pro-

gram by limiting the take of wildlife to the limited number who support the program. It is a condition precedent to the exercise of the privilege of hunting and fishing. It is because of this fact that this particular statute is not brought within the constitutional veil of tax laws which have properly granted exemption to veterans and it is because of this fact that our decision in this case does not cast a "doubt of unconstitutionality" upon those laws.

The exemptions and benefits granted to veterans in the circumstances above referred to by appellee have been permissible not merely (1) because veterans constitute a "special class of citizens," but for the further reason that the facts in each instance also brought the case within the second fundamental requirement, (2) that the factual basis for *the classification bore a reasonable and direct relationship to the real or primary purpose of the law granting the special consideration:* 56 Am. Jur., §9, p. 89, 83 A. L. R. 1231, *Ratta* v. *Healy* (1932) (D. C.), 1 F. Supp. 669. This most basic and fundamental principle is determinative of our decision in this case.

Since it is admitted that veterans are a special class of citizens for the purpose of laws related to their military service, our decision is made to rest upon a determination as to whether or not the facts in this case meet the test of this principle, namely, that there also be a reasonable relationship between the basis for classification (military service) and the purpose of the Act under consideration (§11-1401, et seq., *supra*). Because of the fact that the license fee and the privilege it affords are inseparably related to the purpose of the Conservation Act, and because of the further fact that we find no reasonable relationship between military service and the purpose of the Act or the privilege of

hunting and fishing, we have concluded that §11-1424, *supra,* fails to meet the test of constitutionality.

Perhaps the most persuasive argument in support of the principle on which this case has been decided is found in the reported cases themselves. Although no cases have been cited and after diligent search none have come to our attention which have considered the constitutionality of a statute identical to that with which we are here concerned, many states have considered the constitutionality of analogous laws which have exempted veterans from the payment of peddlers' license fees. The necessity of such a relationship between military service and the subject of the Act by which a special privilege is granted is specifically recognized in the case of *Farley* v. *Watt* (1933), 165 Okla. 6, 7, 8, 23 P. 2d 687, *supra,* relied upon by appellee and quoted at length. In that case the court considered the constitutionality of a law which exempted needy and disabled veterans from the payment of a peddler's license fee. The court concluded its opinion with this statement:

> "While it may be true there is no relation between the service of a soldier and the business of a peddler, yet there is a relation between the duty of the sovereign and the granting of a privilege to a needy or disabled soldier which will enable him to provide for his daily needs so as to relieve society from his maintenance and care."

This fundamental principle has been the deciding factor in nearly all the cases which considered the validity of legislation which has exempted veterans from the payment of peddlers' license fees. In those cases where the exemption has been made to apply to *indigent and disabled veterans,* the legislation has been generally upheld for the reasons stated in the cases of *Farley* v.

*Watt, supra; City of Macon* v. *Samples* (1928), 167 Ga. 150, 145 S. E. 57; *State* v. *Montgomery* (1899), 92 Me. 433, 43 A. 13; *State* v. *Whitcom* (1904), 122 Wis. 110, 99 N. W. 468. However, as far as we are able to learn, where such exempted veterans were *not* disabled or indigent, the courts of all the states, except only New Jersey,[1] which have passed upon the question, have declared legislation making such exemption unconstitutional as granting a special privilege to a class of citizens without any reasonable relationship between the class and the purpose of the Act granting the special privilege.

United States.—*Ratta* v. *Healy, supra;*

Alabama.—*McLendon* v. *State* (1912), 179 Ala. 54, 60 So. 392;

Illinois.—*Marallis* v. *Chicago* (1932), 349 Ill. 422, 182 N. E. 394, 83 A. L. R. 1222;

Iowa.—*State* v. *Garbroski* (1900), 111 Iowa 496, 82 N. W. 659, 56 L. R. A. 570;

Massachusetts.—*Com.* v. *Hana* (1907), 195 Mass. 262, 81 N. E. 149;

Mississippi.—*Adams* v. *Standard Oil Co.* (1910), 97 Miss. 879, 53 So. 692;

South Carolina—*Laurens* v. *Anderson* (1906), 75 S. C. 62, 55 S. E. 136;

Texas.—*Ex parte Jones* (1897), 38 Tex. Crim. Rep. 482, 43 S. W. 513;

Vermont.—*State* v. *Shedroi* (1903), 75 Vt. 277, 54 Atl. 1081;

Washington.—*Larson* v. *Shelton* (1950), 37 Wash. 2d 481, 224 P. 2d 1067;

Wisconsin.—*State* v. *Whitcom, supra.*

Because of their clear analogy, the foregoing cases

1. It is significant that the New Jersey Court in the case of *Strauss* v. *Burough of Bradley Beach*, 117 N.J.L. 45, 186 A. 681, in a one-page opinion, only discussed the fact that veterans were a "class distinct from the mass of . . . citizens." It did not consider the necessity of a reasonable relationship between the class and the subject of the Act.

are highly persuasive as to the determination of the issue presented in this case and we accept the reasoning of those cases as controlling. To rule otherwise would be to establish a principle that every individual who belonged to a group which had performed a distinct public service which the legislature might consider worthy of "appreciation and respect," could properly be exempted from every obligation of government and/or be made the recipient of every preference or special privilege which a benevolent legislature might choose to grant. Persons who might receive such special consideration might include ministers, policemen, firemen, school teachers, civil defense workers or public officials or members of the "party" for that matter. For what court could contradict the legislature and deny that as a class they had not performed some public service worthy of appreciation and respect? The basis of the classification would not be material since it would no longer be necessary that there be any relationship between the basis of the classification and the purpose of the Act giving the special privilege or immunity. Should we have ruled otherwise, the veteran would have his free license, but in permitting it we would have stultified the whole concept of human equality which our ancestors, over many centuries, struggled to attain and which our veterans themselves fought and died to preserve.

Section 11-1424, *supra,* places the veteran and the non-veteran in an unequal position, with respect to the privilege of hunting and fishing. The privilege is not related to his military service; therefore, the statute is in violation of constitutional provisions prohibiting the granting to a class of citizens privileges and immunities which, upon the same terms, do not equally belong to all citizens.

### DISSENTING OPINION

EMMERT, J.—This is an appeal from a judgment on a finding that §11-1424, Burns' 1942 Replacement (Supplement) (Acts 1937, ch. 21, §33, p. 64; 1943, ch. 266, §1, p. 757; 1945, ch. 93, §1, p. 209), was constitutional. Appellant's second amended complaint charged that (1) the act denied appellant equal protection of the law, granted a special privilege and immunity to a certain class of citizens upon a purely arbitrary basis, and deprived him of property without due process of law under the Fourteenth Amendment, (2) that said section was in conflict with Section 21 of Article I of the Constitution of Indiana, and (3) it contravened Section 23 of Article I of the same Constitution.[1]

It is regrettable that in the first instance such a grave constitutional issue was decided by an opinion (123 N. E. 2d 452) filed with such expedition that no opportunity was given to submit a dissent to the other members of the court. In my dissent filed December 27, 1954 (123 N. E. 2d 457), attention was called to twenty-two other acts of the General Assembly over which the majority opinion cast a cloud of constitutional doubts. Appellant's attack endangers every veterans' enactment of this state, and the reasoning used in deciding this appeal will be a precedent for all courts when the validity of any of these acts comes in question.

When the cause was reargued on the petition for rehearing, appellant sought to escape the logic of the

---

1. "No man's particular services shall be demanded, without just compensation. No man's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." Section 21, Article I, Constitution of Indiana.

"The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Section 23, Article I, Constitution of Indiana.

majority opinion by taking the position that all other veterans' legislation was constitutional, and only the act granting veterans free permits to hunt, trap and fish was unconstitutional. In this he seemed to "strain at a gnat, and swallow a camel." I am not impressed with reasoning which grants that pensions, bonuses, land grants, tax exemptions, burial benefits and G. I. Bill of Rights benefits, which in the aggregate have cost the taxpayers millions of dollars, are constitutional, but a free permit, which costs a non-veteran $2.00 a year, is unconstitutional.

If we are to avoid declaring the law by judges rather than by courts, we must unflinchingly adhere to the constitutional requirement that courts do not sit as the General Assembly. Whatever may be the judges' individual opinions concerning the wisdom, justice or necessity of veterans' legislation, such considerations have nothing to do with determining whether such an act is constitutional or not. This rule is well settled by the authorities, and deserves more than mere lip service.

> "This court is bound by the same Constitution and has no right to curtail legislative authority this side of the expressed limitations in it. Nor has this court power to revolutionize the fundamental law by reading limitations into it. This court has nothing to do with the wisdom or unwisdom of the legislative act. A law may . be repugnant to general principles of justice, liberty and rights not expressed in the Constitution, and yet the courts have no power to strike it down." *Schmitt, Supt.* v. *F. W. Cook Brewing Co.* (1918), 187 Ind. 623, 626, 120 N. E. 19, 3 A. L. R. 270.

> "It may be that the act in question is unwise, as a matter of public policy, but as to this we have nothing to do. This was a matter to be determined alone by the members of the legislature. It was

enacted by the people through their chosen representatives." *Bolivar Twp. Bd. of Fin. of Benton Co. v. Hawkins* (1934), 207 Ind. 171, 197, 191 N. E. 158, 96 A. L. R. 271.

". . . a legislative enactment is not to be overthrown because the court may be of opinion that it is harsh in its operation, or that it would have been wiser to have allowed a larger freedom to the individual. As was said by Mr. Justice Holmes in *Otis* v. *Parker* (1903), 187 U. S. 606, 23 Sup. Ct. 168, 47 L. Ed. 323: 'While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution instead of embodying only relatively fundamental rules of right, as generally understood by all English speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held *semper ubique et ab omnibus.*' " *United States Express Co.* v. *State* (1905), 164 Ind. 196, 212, 213, 73 N. E. 101.

"The legislative power in this State, where the constitution imposes no limits, must be practically absolute, whether it operate according to natural justice, or not, in any particular case; for when a law is created by the legislature the executive must enforce it, and is vested with control of the military power of the State to enable him to do it; and, aside from the physical power of the united people of the State, there is no power to arrest the execution except the judiciary, and that department can only do it when the law conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power. *Herman* v. *The State,* 4 Am. L. Reg. 344.—*Beebe* v. *The State,* 6 Ind. R. 501." *The Madison and Indianapolis Raliroad Co.* v. *Whiteneck* (1856), 8 Ind. 217, 222.

"If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it shall be found that those principles are placed beyond legislative encroachment by the Constitution." 1 Cooley, *Constitutional Limitations* (8th Ed.), p. 349.

There has never been any doubt as to the validity of federal pensions. "Power to grant pensions is not controverted, nor can it well be, as it was exercised by the States and by the Continental Congress during the war of the Revolution; and the exercise of the power is coeval with the organization of the government under the present Constitution, and has been continued without interruption or question to the present time." *United States* v. *Hall* (1878), 98 U. S. 343, 346, 25 L. Ed. 180.

Legislative benefits have been the established public policy of this territory since the time Virginia acquired it by conquest during the American Revolution.[2] The Commonwealth of Virginia, by an act of its General Assembly on January 2, 1781, set aside 150,000 acres of land located in what is now Clark, Floyd and Scott Counties of this state, to be given the veterans of the Illinois Campaign. Wm. H. English, Conquest of the Country Northwest of the River Ohio and Life of General George Rogers Clark, Vol. 2, Ch. XXI, *et seq.* *Henthorn* v. *Doe* (1822), 1 Blackf. 157. The veterans of other campaigns by Clark in the Northwest Territory were not so compensated.[3]

---

2. General George Rogers Clark was not an officer of the Continental Congress. He was on officer of the Virginia Militia.

3. The amount of land received by each veteran depended upon his rank. Clark received 8,049 acres. Lt. Col. Mongomery received

There is no necessity of making a review of the various legislative acts granting lands to veterans by reason of military service, but we have not been cited to any case nor do we know of any case wherein such a grant has been held the granting of a prohibited special privilege or immunity, or lack of equal protection, or a denial of due process.

Appellant on reargument took the position that fish and game belong to all the people from the time of the Magna Charta and that, therefore, the free permit act was unconstitutional.[4] "The common law vests the title of game and fish, not reduced to possession or under restraint, in the sovereign power—in Great Britain, in the King; in the United States, the several states, in trust for their inhabitants. No one has any absolute property right in game or fish while in a state of nature and at large, and the right to take them may be restricted or prohibited, and, when granted or exercised, it is a privilege." *State* v. *Ashman* (1910), 123 Tenn. 654, 657, 135 S. W. 325. The Indiana cases are in accord. *Smith* v. *State* (1900), 155 Ind. 611, 612, 58 N. E. 6; *State* v. *Lewis* (1893), 134 Ind. 250, 253, 33 N. E. 1024.[5] See also 27 C. J. 942; 22 Am. Jur. 666; 24 Am. Jur. 374.

---

4,851 acres. Majors received 4,312 acres, captains were alloted 3,234 acres, lieutenants were alloted 2,156 acres. Sergeants were alloted 216 acres, while privates received only 108 acres.

4. We fail to find anything in the Magna Charta (1215) which declares that all fish and game was held by the Crown for the use of all the people. It did state, "All Forests which have been made in our time, shall be immediately disforested; and it shall be so done with Water-banks, which have been taken or fenced in by us during our reign." Richard Thomson, an Historical Essay on the Magna Charta of King John, p. 85. The present common law rule came later.

5. "It is important to note that American quails are game birds and as such belong to the State in its sovereign capacity as the trustee of the citizens in common." *Smith* v. *State* (1900), 155 Ind. 611, 612, 58 N. E. 1044.

" 'Fish are *ferae naturae*, and as far as any right of property in them can exist, it is in the public, or is common to all. No

But the beneficial interest of the people in wild fish and game is no different than the interest of the public in the public lands, for "the public lands of the United States are held by it, not as an ordinary individual or proprietor, but in trust for all the people of all the states." 42 Am. Jur. 785, *Public Lands*, §3. Since the sovereign may constitutionally give public lands to veterans in recognition of their military service, where is any constitutional prohibition violated by granting a free permit to hunt, trap and fish, when the beneficial legal status of wild game and fish is the same as the public lands?

Rhetorical paragraph 13 of appellant's second amended complaint charges that he was denied equal protection of law and his property taken without due process and a special privilege and immunity was granted because Indiana received less federal revenues collected under U. S. C. A. Title 26, Sections 3406, 3407, and Title 16, Section 777, *et seq.* and 669 *et seq.* This argument is wholly specious. The two acts are clearly another effort by the federal government to feudalize all the states by preempting tax revenues, thus forcing the vassal states to go to the great overlord in Washington to get back the taxes their citizens have paid, less of course a handling charge, estimated by Senator Byrd to be at least 15%. Naturally our court is not concerned with the legislative policy on this, but it is interesting to note that the 85th session of the General Assembly attracted nationwide attention by a Concurrent Resolution, Ch. 377, Acts 1947, Vol. 2, pp. 1509, 1510, condemning this growth of national feudalism as follows:

individual property in them exists until they are taken and reduced to actual possession. 2 Black. Com. 392.' " *State* v. *Lewis* (1893), 134 Ind. 250, 253, 33 N. E. 1024.

"Indiana needs no guardian and intends to have none. We Hoosiers—like the people of our sister states—were fooled for quite a spell with the magician's trick that a dollar taxed out of our pockets and sent to Washington, will be bigger when it comes back to us. We have taken a good look at said dollar. We find that it lost weight in its journey to Washington and back. The political brokerage of the bureaucrats has been deducted. We have decided that there is no such thing as 'federal' aid. We know that there is no wealth to tax that is not already within the boundaries of the 48 states.

"So we propose henceforward to tax ourselves and take care of ourselves. We are fed up with subsidies, doles and paternalism. We are no one's stepchild. We have grown up. We serve notice that we will resist Washington, D. C., adopting us. . . ."

There is no constitutional mandate in either the Federal or the Indiana Constitution requiring Indiana to get all the federal aid it can. It is the right of the General Assembly to determine as a matter of legislative policy how much federal aid Indiana should accept.

It may as well be argued that the target shooter, the trap and skeet shooter have their constitutional rights to equal treatment invaded when in one afternoon of match shooting they burn more ammunition than is expended in any county during a whole week of open season hunting. They may never hunt game, yet they pay the federal tax on ammunition just the same. Appellant has no property right in any of these federal funds, nor have any of his privileges or immunities been taken away, nor does he have any property right in any potential "fish, frogs, mussels, wild birds, wild animals, or game" not yet in existence.

Section 21 of Article I of the Indiana Constitution has no application to any asserted rights by appellant.

"This provision of the Constitution was not intended as a restriction upon the State's taxing power, but relates only to the exercise of the power of eminent domain. This court at an early day made the distinction clear and unmistakable by the use of the following words: 'Property may be taken, through the taxing power, for public use, without any other compensation than the common benefit which the appropriation and expenditure of the proceeds of the tax produce. It is only the taking of specific pieces of the property of an individual, by virtue of the right of eminent domain, that is prohibited by the Constitution, without special compensation.' "

*Hanly* v. *Sims* (1910), 175 Ind. 345, 353, 93 N. E. 228. See also *State, ex rel.* v. *Steinwedel* (1932), 203 Ind. 457, 471, 180 N. E. 865.

Neither the Fourteenth Amendment nor Section 23 of Article I of the Indiana Constitution prohibit reasonable classification by the legislature.

"If the statute in question makes the exemption apply to one citizen and not to another in like situation, it is then an arbitrary or capricious classification. The rule of equal protection of law only requires that persons similarly situated shall be treated alike, or that the law shall apply to all who are in the same class. The Fourteenth Amendment was intended to secure equality of all rights, and to render unconstitutional all laws which may be construed as applying to persons or property arbitrarily and with discrimination, unequally or unjustly. . . .

". . . The court recognizes that, for legislative purposes, it is within the province of the Legislature in the first instance to determine what classification is just and reasonable in view of the purpose to be attained. The court will not lightly substitute its judgment for that of the Legislature. A classification made by the Legislature will be sustained unless it is so manifestly and unmistakably arbitrary as to leave no room upon which reasonable minds may differ." *Martin* v. *Loula* (1935), 208 Ind. 346, 352, 354, 355, 194 N. E. 178, 195 N. E. 881.

As was said by the Supreme Court of the United States in *State Bd. of Tax Commissioners* v. *Jackson* (1931), 283 U. S. 527, 537, 51 S. Ct. 540, 75 L. Ed. 1248, 1256, in holding the Indiana Chain Store Tax constitutional, "The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, *American Sugar Ref. Co.* v. *Louisiana*, 179 U. S. 89, 45 L. Ed. 102, 21 S. Ct. 43, *or if any state of facts reasonably can be conceived to sustain it. Rast* v. *Van Deman & L. Co.*, 240 U. S. 342, 60 L. Ed. 679, L. R. A. 1917A, 421, 36 S. Ct. 370, Ann. Cas. 1917B, 455; *Quong Wing* v. *Kirkendall*, 223 U. S. 59, 56 L. Ed. 350, 32 S. Ct. 192." (Italics supplied.)

All legislation which applies to two or more people is class legislation, but it does not necessarily follow it is unreasonable or unconstitutional. As was said by this court in holding §10-4219, Burns' 1942 Replacement, constitutional, although it only prohibited males from frequenting or visiting a house of ill fame or a gambling house,

"Any classification that may be made, necessarily is arbitrary. The most that can be said is that some may be more arbitrary than others. Horack's Sutherland Statutory Construction (2d Ed.) §2106— quoted in *Perry Twp.* v. *Indianapolis Power & Light Co.*, *supra*, at page 68.

"The desirability, or need for legislation is entirely for the legislature to determine. The question of its wisdom in adopting a classification is a matter of no concern to the courts. The courts may determine only whether the classification is founded on substantial distinctions in the subject matter, or is so manifestly unjust and unreasonable as to destroy the lawful use of property." *State* v. *Griffin* (1948), 226 Ind. 279, 288, 79 N. E. 2d 537.

Patriotism is no idle sentiment. If the Legislature chooses to perpetuate its memory or reward patriotic sacrifices by gifts or exemptions, it has the constitutional right to classify veterans for that purpose. The fact that the power might conceivably be abused no more makes it unconstitutional than every tax law would be unconstitutional because the power to tax is the power to destroy. The so-called Vermont rule, deciding that military service is no reasonable basis for classification, *State* v. *Shedroi* (1903), 75 Vt. 277, 54 Atl. 1081, 63 L. R. A. 179, wholly ignores the history of veterans' legislation as well as the realities of modern military service. The fallacy of the Vermont rule was thoroughly exposed in *Farley* v. *Watt* (1933), 165 Okla. 6, 7, 8; 23 P. 2d 687, 689:

"We do not agree with this view. In the first place, the soldiers of the late war were selected from a particular class. It was a governmental classification. The government selected male citizens of a particular age. The vast majority of those who served were between the ages of 18 and 31. They were then in the formative stages of their lives. Many of them when discharged did not, as the Vermont court said, become a part of the general mass of mankind. For far too many there was no Armistice, there was no discharge, but simply the padded cell, the hospital cot, the white cross. The war definitely interrupted the studies, the vocations, the businesses of those young men who were making essential preparations for occupational or professional careers. Those who were classified and called away were handicapped not only by an interrupted preparation, but by a tremendous inflation of values which met them upon their return. They were handicapped by physical disability incident to their governmental service and in wealth and opportunity. They constituted a distinct class distinguished from the mass of society—a class created by deprivation of equal opportunity in civil pursuits at home and marked by disability incident to defense of

their country abroad. *Marallis* v. *Chicago*, 349 Ill. 422, 182 N. E. 394, 83 A. L. R. 1222."

The court could well have added that time does not cure everything for the veterans. Even those who returned without being wounded or diseased bear the hidden scars in mind and body which will never change. Few escaped a permanent change of personality when suddenly taken from civilian life and necessarily trained to kill by every means of violence permitted by the rules of warfare. Nor will they ever regain the depletion of their reserve of nervous and physical energy, nor can they ever fully recover from the heavy strains of training or battle. Excessive strain, according to modern medical science, may be responsible for much undue shortening of the life span. To hold that military service *per se* does not furnish an adequate and reasonable basis for classification is to consider modern warfare no different than that waged before the Napoleonic wars, when its practice was more gentlemanly than aggressive.

There is no legal reason or cause for putting a veteran's preference on a different basis than a pension act. As was stated in *State ex rel. State Reclamation Board* v. *Clausen* (1920), 110 Wash. 525, 542, 188 P. 538, 544, 14 A. L. R. 1133:

"Some contention is made that the law is unconstitutional, in that it violates the equal privileges and immunities guaranty of our Constitution, because it contemplates, in the disposition of the lands, the giving of preference rights to soldiers. All arguments that could be made against the law upon this ground could, with equal force, be made against every pension law that was ever enacted by the Congress of the United States, or any of the states. Manifestly this contention is without merit."

With equal persuasion the same logic applies to a veteran's exemption, such as involved in the appeal at bar.

It is a well-known historical fact that the railroads of the West received millions of acres of the public lands of the United States without consideration other than the stimulation of commerce, industry and the settlement of the West. 50 C. J. 1028; 42 Am. Jur. 823, Public Lands, VIII, Grants in Aid of Railroad Construction. Certainly it had nothing to do with conservation of fish and game, and in fact it hastened the depletion of those natural resources. It is difficult to comprehend how a veterans' free permit is an unconstitutional special privilege and immunity, or is the result of unreasonable classification, and at the same time these vast grants of the public domain are constitutional.

The reasoning in *Larson* v. *City of Shelton* (1950), 37 Wash. 2d 481, 224 P. 2d 1067, is wholly inapplicable to the facts in the appeal at bar. Section 11-1424, Burns' 1942 Replacement (Supplement), does not create any different rules for hunting, fishing or trapping for the veterans, does not excuse them from complying with all criminal laws concerning fish and game, does not authorize them to hunt, fish or trap without a permit, nor does it authorize any veteran to hunt or fish by trespassing upon the lands of another. If this court were to hold the veterans' permit section unconstitutional, then *a fortiori* it must hold subsections a, b, and d of §11-1405, Burns' 1942 Replacement, which authorizes the owner and the tenant to hunt, fish and trap on their lands without a license, and a person under 18 years of age to fish without a license, are unconstitutional and void, since the fish and game belong to the sovereign for the use and benefit of all the people. Section 11-1403, Burns' 1942 Replacement, also would be unconstitutional because it provides for different license fees for different persons, purposes and uses.

The fact that the regulation of fishing, hunting and

trapping is done under the exercise of the police power of the state does not *per se* make the classification bad. This court, by rules, exercises the police power to protect the public in the admission of members to the bar of this state. Rule 3-1 adopts a grandfather's clause admitting all to practice law who were attorneys in good standing prior to July 1, 1931. Rule 3-17A classifies those in or going to the armed forces, and under this rule it is possible for a graduate of a law school to be admitted to the practice when he could never pass the bar examination. "During the emergency now existing, and until further order of this court, any person who has been graduated from an accredited law school, as described in these rules, and who has not taken a bar examination, who shall receive orders requiring him to commence active duty with the armed forces of the United States on a date prior to the 5th day following the next examination subsequent to his graduation may be admitted without examination upon motion of the State Board of Law Examiners. . . ." Rule 3-17A.

It is error to assume that the public health, morals, order, safety and general welfare can only be protected by the purchase or conservation of "fish, frogs, mussels, wild birds, wild animals, or game." The public welfare also includes the promotion and appreciation of patriotism. For all we know, the General Assembly may have assumed that it would promote the health and nervous stability of the veterans to be encouraged in outdoor pursuits, and that hunting and fishing would help them forget the hidden scars of war, and improve their general mental health.

I am unable to see where there is any difference between giving a state bonus or payment under the federal G. I. Bill of Rights, Title 38 U. S. C. A. §693, *et seq.*, and a free permit. Under the reasoning urged by the

appellant, any veteran of the Spanish American War or World War I has been denied equal privileges and immunities because he had no state bonus as had been paid to veterans of World War II. The veterans of the Korean War with equal justice could make the same complaint, because their bonus rights are different than the veterans of World War II.

The statutory price for a yearly license to hunt, trap and fish is $2.00. If the General Assembly, by statute, had provided that each veteran buying such a permit, be reimbursed from the general fund the sum of $2.00 for each license purchased, this lawsuit would never have been commenced. Such reimbursement would not be materially different than a bonus. But the federal aid, which was the motivating cause for this suit, would have been forthcoming. The state gives the veteran a piece of paper in one case, worth $2.00 a year, and in another case, under the Bonus Act, it gives him a piece of paper in the form of a warrant drawn upon the Treasurer of State which may be worth several hundred dollars, according to his service.[6] Many of the veterans of World War I obtained and carried the permits not because they were going to use them, but because it was the only thing the State of Indiana had ever given them as a token of its appreciation for their military service. Now the appellant seeks to have this court forget their service to this country in time of national peril.[7]

---

6. Appellant in this case was not able to offer any evidence at all as to the number of veterans who were using their permits in any one year.

7. . This too prevalent tendency has been well noted by Kipling when he wrote:

> "It's Tommy this, an' Tommy that, an'
> 'Chuck 'im out, the brute!'
> But it's 'Savior of 'is country,' when
> the guns begin to shoot."

Nor is there any validity in the suggestion that the purpose of Ch. 21 of the 1937 Acts, as amended, was conservation of "fish, frogs, mussels, wild birds, wild animals, or game," therefore the act could not reward patriotic service or stimulate patriotism. The title of the Act is "An act concerning fish, frogs, mussels, game, wild birds, and wild animals, and offenses relating thereto." The generality of the title of an act does not make it unconstitutional.

"The generality of a title is no objection to it so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. If the title to an act covers a general subject it need not go further and mention all matters that are germane to such subject nor is it necessary that details be mentioned in the title to the act." *Crabbs* v. *State* (1923), 193 Ind. 248, 255, 139 N. E. 180.

"The purpose of §19, Art. 4, *supra,* was (1) to prevent 'log rolling' legislation; (2) to prevent surprise, or fraud, in the legislature by means of provisions in bills of which the titles give no intimation, and, (3) to apprise the people of the subject of legislation under consideration. Cooley, Const. Lim. (7th ed.) 205; *Bright* v. *McCullough* (1866), 27 Ind. 223." *Moore-Mansfield, etc., Co.* v. *Indianapolis, etc., R. Co.* (1913), 179 Ind. 356, 367, 101 N. E. 296.[8]

"This court has many times called attention to the fact that the purpose of the title of an act under the provisions of the Constitution above referred to is merely to express the general topic of the act, and that anything that is relevant or germane to such topic, and not incongruous thereto, is properly included. In other words, what is naturally to be found under the title is properly contained in the act, but any one examining the title must be able to know that he will not be misled by the

---

8. "Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title." Section 19, Article 4, Constitution of Indiana.

inclusion in the act of what would not be expected under such title. The title is not expected to be an index to every part of the act itself." *City of Indianapolis* v. *Buckner* (1954), 233 Ind. 32, 116 N. E. 2d 507, 510.

Many examples of dual purposes of an act could be cited. Chapter 80 of the 1933 Acts entitled, "An act concerning alcoholic beverages and declaring an emergency," was to promote temperance, and provide tax revenues. The Indiana chain store tax act was designed to raise revenues and to prevent monopolies. *Midwestern Petroleum Corp.* v. *State Bd. of Tax Commrs.* (1933), 206 Ind. 688, 187 N. E. 882, 191 N. E. 153. Our many federal tariff laws were designed to raise revenues as well as protect American industry and labor. Our graduated or progressive income tax and inheritance tax laws are designed to raise revenues as well as redistribute the wealth. See Marx and Engels "Manifesto of the Communist Party," Kerr & Company, Chicago, pp. 40-41. The death taxes in England have about accomplished that purpose. Indiana's graduated inheritance tax could be increased to accomplish the same dual purposes of raising additional revenue and redistributing the wealth. This court is not any Constitutional Convention or any ratifying convention on a constitutional amendment, and we have no judicial right or duty to rewrite §19 of Article 4 by holding that each act could embrace but one purpose when the language used is "Every Act shall embrace but one subject . . . ."

There is no reasonable basis for assuming that the many acts of the Congress and the state legislatures granting bonuses, service connected compensation, pensions, G. I. benefits, land grants or tax exemptions can only be sustained on the theory they were to assist the veteran in readjusting himself to civilian life. The appreciation, preservation and stimulation of patriotism

are always involved as a reason for such legislation, and the particular means the legislature may adopt to express gratitude ought not be upset by the courts except where it specifically contravenes a specific constitutional prohibition, or no reasonable man could say it was valid when it involved a mixed question of law and fact, such as due process.

Therefore I dissent. The petition for the rehearing should have been granted and the judgment of the trial court affirmed.

Levine, J., joins in this dissent.

NOTE.—Reported in 123 N. E. 2d 452.

Rehearing denied 126 N. E. 2d 879.